**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JOSEPH F. DRAKE,
            *Defendant-Appellant.*

No. 06-10073

D.C. No.
CR-05-00050-DWM

OPINION

Appeal from the District Court Guam
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
November 1, 2007—Honolulu, Hawaii

Filed September 15, 2008

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Gretchen Fusilier, Carlsbad, California, argued the cause for the defendant-appellant and filed the briefs.

Rosetta L. San Nicolas, Assistant U.S. Attorney, Guam, argued the cause for the plaintiff-appellee and filed the brief; Leonardo M. Rapadas, Guam and NMI, was on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a two-year delay between indictment in the local Guam courts and eventual conviction on different charges in federal district court violated a defendant's right to a speedy trial.

I

A

In the early morning hours of September 14, 2003, a Mobil Mart in Sinajana, Guam, was robbed at gunpoint. The cashier, Angel Guzman, reported that a man entered the store at about 2:50 a.m. and asked for cigarettes. As Guzman turned to retrieve the cigarettes, the man "picked up his shirt, pulled out a gun," and demanded cash. Guzman opened the register and turned over $85.00. The robber then "backed out of the store, alternately pointing the gun at Ms. Guzman and [at the gas station attendant.]" The store's digital surveillance system captured the robbery, which lasted less than one minute.

After the robber made his escape, Guzman called the Guam police, who promptly alerted nearby officers that the store had been robbed. Police officers converged on the Mobil Mart within minutes. Guzman told police that the robber was "dark complexioned, male, Guamanian, approximately 30 years old, wearing a dark short-sleeve shirt, brown shorts, brown baseball cap over a blue shirt, and black slippers with tattoos on his forearm." The gas station attendant could not describe the robber, but described the gun as "silver colored." Later that morning, in a written statement, Guzman estimated that the robber was about five foot one.

While the officers at the Mini Mart interviewed the employees, Guam policemen Matthew Cepeda and James

Rosete were hunting for the robber. As Cepeda and Rosete approached Nelson Road, which leads directly to the store, the officers saw a "vehicle travelling [sic] at a high rate of speed" that then "came to an abrupt stop." No other cars were in the immediate vicinity. The driver of the car "look[ed] at [the officers] and slowly [turn[ed] away." The officers testified that they believed "the vehicle had been driven hard" because they smelled "burning fluid within the vehicle." Thinking they had found the robber, Cepeda and Rosete stopped the car, drew their weapons, and approached the vehicle. They ordered the driver and the two passengers out of the car. After discovering two revolvers and a pistol inside the car, the officers arrested the occupants. One of the passengers was Joseph Drake.

At about 3:30 a.m. the officers at the Mobil Mart received word that their colleagues had a suspect in custody. The officers told Guzman "that they had captured the suspect" and brought her to the site of the traffic stop to make an identification. When Guzman arrived, Drake was handcuffed and surrounded by uniformed police officers. He was about 30 years old, had a dark complexion, appeared Guamanian, and was five foot nine. He was also wearing brown shorts, a dark short-sleeve shirt, and slippers, and had tattoos on his arm. In addition, officers found a baseball cap in the car. From "the back of a patrol car about 10 feet away from the suspect," Guzman "positively identified" Drake as the robber. Four days after the robbery, Guzman was shown a photo lineup of six men and again selected Drake as the perpetrator.

Half an hour after Drake's arrest, police officers watched the video of the robbery recorded by the store's surveillance system. The officers tried to obtain a copy of the recording from the manager of the Mobil Mart, but instead received a "floppy disk containing fourteen . . . still images from the surveillance camera, depicting the robbery in commission." After thirty days, the original digital recording of the robbery was automatically deleted and permanently lost.

B

Two weeks later, on September 26, 2003, a grand jury in the Guam Superior Court indicted Drake on seven charges, including second degree robbery, theft, and possession of a concealed weapon.[1] A co-defendant, Earl Wusstig, was also indicted on five of the seven charges. Over the next eight months, trial dates were set and abandoned several times.[2]

Almost a year later, on June 1, 2004, another grand jury in the Guam Superior Court re-indicted Drake on identical charges. The new indictment dropped Wusstig, the co-defendant, but was otherwise identical to the 2003 indictment. The record is again unclear regarding why the first indictment was dismissed.

Over the next year, the court changed Drake's appointed counsel several times. Drake filed several motions to dismiss which further delayed the proceedings. He also waived his right to a speedy trial four separate times, and asserted the same right three times.[3] The record does not disclose the reasons for the waivers and the reassertions of the right.

About a year after the second indictment, Drake's prosecution was turned over to the federal government. On June 15, 2005, a grand jury in the District of Guam indicted Drake on

[1]Specifically, Drake was charged with (1) second degree robbery with a special allegation of possession and use of a deadly weapon in the commission of a felony; (2) theft; (3) conspiracy to commit theft; (4) possession of a firearm without an identification card; (5) possession of a concealed weapon; (6) possession of an unregistered firearm; and (7) possession of a schedule II controlled substance.

[2]The reasons for the repeated continuances are not clear from the record, but Drake's court-appointed counsel failed to appear at a hearing at least once.

[3]The waivers occurred on October 3, 2003, December 11, 2003, March 9, 2004, and July 2, 2004. Drake asserted his right to a speedy trial on November 28, 2003, February 25, 2004, and October 6, 2004.

one count of Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951(a), one count of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a), one count of using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Though the federal charges differed from their state counterparts, they were based on the same conduct as the prior Guam Superior Court indictments. Drake appeared in the district court for arraignment on June 17.

A month later, on July 20, Drake moved to dismiss on various grounds. He alleged that the nearly two-year delay between indictments violated his right to a speedy trial. Drake argued that the delay should be measured from the date of his first indictment in the Guam Superior Court rather than the date of his federal indictment because the United States and the Territory of Guam are a "single sovereignty." In addition, Drake claimed that the traffic stop leading to his arrest was not supported by reasonable suspicion and that all evidence resulting from the stop should be suppressed as "fruit of the poisonous tree." Drake also contended that the indictment should be dismissed because the Guam police department failed to preserve the videotape of the robbery. Finally, Drake claimed that the on site "show up" and photo array identifications were impermissibly suggestive and should be suppressed.

The district court denied all of Drake's motions.[4] "Assuming, without deciding" that the United States and Guam are a "single sovereignty," the court nevertheless concluded that the federal charges were distinct from the state charges. The court accordingly measured the delay from the federal indictment to the conviction: four months. In addition, the court pointed out that the Speedy Trial Act excludes "[a]ny period of delay

---

[4]The court disposed of the last of Drake's motions on September 23, 2005, sixty-six days after Drake filed the motions.

resulting from other proceedings concerning the defendant," which the court interpreted to cover the proceedings in the Guam Superior Court. The district court also found that the traffic stop was supported by reasonable suspicion, that neither the show up nor the photo array identifications were impermissibly suggestive, and that the loss of the videotape did not violate Drake's due process rights.

Drake's trial began on October 3, 2005 and lasted two days. He was convicted on all counts. In January 2006 Drake was sentenced to 235 months imprisonment followed by five years of supervised release. This appeal followed.

## II

We begin with Drake's argument that the two-year delay between the 2003 indictment and the 2005 conviction violated his constitutional and statutory rights to a speedy trial. We consider Drake's constitutional argument first.

## A

[1] The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend VI. Although non-fundamental "federal constitutional rights do not automatically apply to unincorporated territories [such as Guam]," Congress may extend such rights to an unincorporated territory by statute. *Guam v. Guerrero*, 290 F.3d 1210, 1214 (9th Cir. 2002).

[2] In 1950, Congress enacted the Organic Act, codified at 48 U.S.C. § 1421 *et seq*., which created a "Bill of Rights" for Guam paralleling the Bill of Rights in the federal Constitution. 48 U.S.C. § 1421b. The language of the Speedy Trial Clause in the Organic Act tracks its federal counterpart almost exactly. *See* 48 U.S.C. § 1421b(g) ("In all criminal prosecutions the accused shall have the right to a speedy and public

trial . . ."). We interpret the Speedy Trial Clause in the Organic Act as coterminous with its corresponding provision in the federal Constitution. *See Guerrero*, 290 F.3d at 1217-18.

**[3]** As in the fifty states, we analyze a Speedy Trial Clause claim by applying the four-part test established by *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The four *Barker* factors are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* We review *de novo* the district court's conclusion that there was no Speedy Trial Clause violation. *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).

**[4]** We turn to the first *Barker* factor: the length of the delay. A central issue raised by this appeal is whether the length of the delay should be measured from Drake's 2003 indictment in the Superior Court of Guam or from his 2005 indictment in federal district court. However, we need not decide this question. Assuming *arguendo* that the clock began running when Drake was indicted in September 2003, Drake has not established that the length of delay, even if inappropriately long, outweighs the other *Barker* factors.

**[5]** Indeed, the second *Barker* factor — the cause of the delay — weighs in favor of the government. Though the government bears the "ultimate responsibility" for justifying the delay, the record here does not disclose any "deliberate attempt to delay the trial in order to hamper the defense." *Barker*, 407 U.S. at 531. The district court found that "most of the delay in the Superior Court cases stem from motions filed on Drake's behalf, changes in counsel (of which there had been no less than four), and Drakes' [sic] several filing [sic] of waiver [sic] of his right to a speedy trial only to 're-assert' the same right in subsequent proceedings." We agree with the lower court that the reason for the delay weighs against finding a Speedy Trial Clause violation.

**[6]** The third *Barker* factor, the defendant's assertion of his right to a speedy trial, also weighs in favor of the government. Though Drake asserted his right to a speedy trial three times, he also expressly waived the right four times.

**[7]** Finally, Drake cannot establish that he was prejudiced. The Supreme Court has identified three interests the right to a speedy trial serves: "to prevent oppressive pretrial incarceration . . . to minimize anxiety and concern of the accused . . . [and] to limit the possibility that the defense will be impaired." *Id.* at 532. The Court emphasized that "the most serious [form of prejudice] is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* Though Drake has been incarcerated since his arrest in 2003 and has suffered anxiety and concern, there is no showing that the delay impaired his defense. No witnesses died or disappeared; nothing in the record demonstrates that evidence shown to be helpful to the defense was lost.[5] Drake's pretrial incarceration was not "oppressive" or unjustified, and his anxiety and concern were no more than any criminal defendant experiences before trial.

**[8]** Accordingly, we are satisfied that the district court did not err in concluding that Drake's right to a speedy trial under the Guam Organic Act was not violated.

B

Having established that Drake's claim under the Organic Act must fail, we next consider whether the pretrial delay violated the federal Speedy Trial Act, 18 U.S.C. § 3161(b)-(c). We review *de novo* the district court's conclusion that there

---

[5]One federal agent stated that "[d]ue to the passage of time," he "d[id] not expect" that a log book describing the police dispatch still existed. However, there is no evidence confirming this expectation, and we will not presume prejudice given Drake's responsibility for the delay. *See United States v. Lam*, 251 F.3d 852, 859-60 (9th Cir. 2001).

was no violation. *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 737 (9th Cir. 1989).

**[9]** The Speedy Trial Act requires federal indictments to be filed within thirty days of arrest. § 3161(b). When the defendant pleads not guilty, the trial must begin within seventy days of (1) the filing of the indictment or (2) the defendant's appearance before a judicial officer of the court in which the charges are pending, whichever occurs later. § 3161(c)(1). The Speedy Trial Act's time limits do not apply to proceedings in the Guam Superior Court,[6] but do apply to proceedings in the District Court of Guam. 48 U.S.C. § 1424-4.

**[10]** Certain pre-indictment or pre-trial events, however, toll the time limits. "Any period of delay resulting from other proceedings concerning the defendant," for example, is not counted when computing delay for purposes of the Speedy Trial Act. 18 U.S.C. § 3161(h)(1). More specifically, "delay resulting from trial with respect to other charges against the defendant" is not counted when determining whether the thirty-day arrest-to-indictment time limit has run. *Id.* § 3161(h)(1)(D). We have previously held that "[t]his provision encompasses not only . . . the trial itself but also the period of time utilized in making necessary preparations for trial." *United States v. Lopez-Osuna*, 242 F.3d 1191, 1198 (9th Cir. 2001) (internal quotation marks and citation omit-

---

[6]The Act does not apply to Drake's proceedings in the Guam Superior Court at least in part because they did not involve federal claims. At the time, Drake was charged exclusively with violations of the Guam Code. Section 3161(a)-(c) of the Speedy Trial Act, however, applies only when a defendant has been charged with a "Federal criminal offense which is in violation of any Act of Congress and is triable by any court established by Act of Congress." 18 U.S.C. § 3172(2); *see also id.* § 3161(a)-(c). Because the Guam Code is passed by the Guam Legislature rather than by Congress, the requirements of § 3171(a)-(c) do not apply. *Cf. Gov't of Virgin Islands v. Bryan*, 818 F.2d 1069, 1071-72 (3d Cir. 1987) (charges alleging a violation of the territorial law of the Virgin Islands do not trigger the requirements of the Speedy Trial Act).

ted). Finally, "delay resulting from any pretrial motion" is also excluded from the computation. § 3161(h)(1)(F).

**[11]** Here, approximately twenty-two months separated Drake's arrest from his federal indictment, plainly more than the thirty days permitted by the Speedy Trial Act. However, we conclude that the proceedings in the local Guam courts that preceded the filing of the federal indictment qualify as a "delay resulting from trial with respect to other charges against the defendant" for Speedy Trial Act purposes. § 3161(h)(1)(D). Although Drake was never brought to trial on the original Guam Superior Court charges, the judicial proceedings count as a "period of time utilized in making necessary preparations for trial." *Lopez-Osuna*, 242 F.3d at 1198.

**[12]** Therefore, the thirty-day time limit was tolled when Drake was indicted on September 26, 2003, twelve days after he was arrested. The Guam Superior Court proceedings continued until June 17, 2005, the date the Attorney General of Guam told the United States Attorney's office that the 2004 indictment would be dismissed. All of that time is thus excluded when computing the delay. Since the federal indictment occurred on June 15, 2005, the total non-tolled time between arrest and indictment was twelve days, well within the thirty-day limit.

**[13]** We likewise conclude that the seventy-day time limit between indictment and trial was not exceeded. One hundred and eight days separated Drake's June 17, 2005 arraignment and the start of his trial on October 3. But on July 20 and July 24, Drake filed several motions to dismiss, the last of which was denied on September 23. The trial began on October 3, ten days later. Therefore, sixty-five days between Drake's federal indictment and trial were tolled for purposes of the Speedy Trial Act as "delay resulting from any pretrial motion." 18 U.S.C. § 3161(h)(1)(F). The total non-tolled time thus was forty-three days, within the seventy-day limit.

Accordingly, Drake's rights under the Speedy Trial Act were not violated.

### III

Next, we consider Drake's argument that the traffic stop was not supported by reasonable suspicion and that all evidence obtained as a result of the stop should be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). We review the district court's ultimate conclusion that there was reasonable suspicion *de novo* and its underlying findings of fact for clear error. *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002).

[14] The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Generally, police seizures must be supported by probable cause. In limited circumstances, a lower standard, reasonable suspicion, may justify a police seizure. "In particular . . . law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Hensley*, 469 U.S. 221, 226 (1985).To constitute reasonable suspicion, the officer's belief that criminal activity is afoot must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The Organic Act provides equal protection to the residents of Guam. *See* 48 U.S.C. § 1421b(c) ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .").

[15] The facts here are close. Nevertheless, we cannot say that the district court committed error in finding that reasonable suspicion existed. Although the officers could not see the driver or the passengers clearly, the car was driven "at a high

rate of speed" along a road leading from a store which had been robbed ten minutes earlier. It was very late at night and no other cars were on the road. In addition, the officers smelled "burning fluid," which indicated that the car had been driven quickly. Finally, the driver looked at the officer and slowly turned around, actions which may have conveyed consciousness of guilt to the officers. To be sure, each of these facts, considered by itself, might not give rise to reasonable suspicion. Considering the "totality of the circumstances," however, we conclude that there was reasonable suspicion for the stop. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion.").

**[16]** Because we conclude that the traffic stop was supported by reasonable suspicion, we also hold that the subsequent show-up identification was not "fruit of the poisonous tree." Accordingly, we affirm the district court's admission of the evidence relating to the traffic stop.

IV

We turn next to Drake's contention that the show-up and photo array identifications were impermissibly suggestive. We first consider the identification that immediately followed Drake's arrest.

A

The Due Process Clause of the Fourteenth Amendment provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. A corresponding provision in the Organic Act provides the same protections. *See* 48 U.S.C. § 1421b(e). To determine whether an identification procedure violates a defendant's due process rights, a court must consider "whether under the 'totality of the circumstances' the identification was reliable

even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The "factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200; *see also United States v. Jones*, 84 F.3d 1206, 1209-10 (9th Cir. 1996).

**[17]** Applying these factors here, we hold that the show-up following the traffic stop was not impermissibly suggestive. Though the robbery took place in less than one minute, the district court found that "Ms. Guzman had ample opportunity to view the robber as they were standing face to face in close proximity to each other." The court also found that "it is reasonable to conclude that Ms. Guzman's attention [was] fully focused on the robber, especially because she was fully aware that she was being robbed at gun point." Though Guzman significantly underestimated Drake's height, the district court pointed out that Guzman's initial description of the robber's age, complexion, and clothing matched Drake's physical characteristics. In addition, the court emphasized that Guzman "positively identified" Drake and that the show-up took place within forty minutes of the robbery. We cannot say that these factual determinations are "clearly erroneous."

Drake argues that the show-up was impermissibly suggestive because "there was a clear directive to Ms. Guzman that the person she was about to view was the robber. Nothing could be more suggestive than to have a uniformed officer tell the victim of a crime that officers have just caught the perpetrator for her to identify." Drake also emphasizes that he was handcuffed and surrounded by uniformed police officers when Guzman arrived to make the identification.

These facts standing alone, however, do not compel us to find a pretrial identification impermissibly suggestive. *See*

*United States v. Kessler*, 692 F.2d 584, 585-86 (9th Cir. 1982) ("While it is the better practice not to refer to the subject of a show-up as a 'suspect' . . . the reference by itself is not an impermissible suggestion. The use of handcuffs or other indicia of custody will not invalidate a show-up, at least where necessary for the prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses.").

B

**[18]** We likewise conclude that the identification based on the photo spread was not impermissibly suggestive. As discussed above, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, [and] the level of certainty demonstrated by the witness at the confrontation" also weigh in favor of admitting the photo spread identification. *Biggers*, 409 U.S. at 199. Only the last factor identified in *Biggers*, the length of time between the crime and the confrontation, differs from the analysis of the show-up identification. Here, four days separated the robbery from the photo spread identification. This was not long enough to call the identification's accuracy into question. Indeed, *Biggers* permitted an identification to go to the jury even when seven months separated the crime from the confrontation. *Biggers*, 409 U.S. at 201.

V

Finally, we address Drake's claim that the loss of the digital surveillance video violated his due process rights.

The Supreme Court has long held that police officers must disclose exculpatory evidence to criminal defendants. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To rise to the level of a due process violation when potentially exculpatory evidence is destroyed, the "evidence must both possess an exculpatory

value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

**[19]** Neither of these conditions is met here. The exculpatory value of an item of evidence is not "apparent" when the evidence merely *"could have"*exculpated the defendant. *Arizona v. Youngblood*, 488 U.S. 51, 56 n\* (1988). The digital recording of the robbery here was far from clearly exculpatory; indeed, it is possible that it would have further incriminated Drake. Moreover, comparable evidence was plainly available: fourteen still images of the robbery were preserved and the officers were available to testify to the contents of the recording.

## VI

For the foregoing reasons, Drake's conviction is AFFIRMED.