## WILLIAM SAKIE ARAJAKIS, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 21725

December 3, 1992 843 P.2d 800

[Rehearing denied March 19, 1993]

*David C. Polley,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, and *David B. Barker,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

### Facts

In June, 1988, Barbara Goldfreed (Goldfreed) was playing video poker at the Palace Station casino when she met William Arajakis (Arajakis). The two began discussing automobiles. Goldfreed owned a Cadillac station wagon, and Arajakis told her that he repaired automobiles and also sold classic cars. She complained that her car needed repairs, and that because her automobile was rare, finding parts was difficult for her. Arajakis repaired her Cadillac and later worked on her Chevrolet Blazer. When she was at Arajakis's business, he suggested that he and Goldfreed form a partnership and that each put up half of the money needed to purchase and resell a 1960 Rolls-Royce Silver Cloud at a profit. He also suggested that they purchase a 1963 Mercedes Benz 220, also for the purpose of reselling it at a profit.

Goldfreed hoped that her teenage son, Steffan, might be inspired by classic cars, because her late husband had been in the automobile insurance business. When Arajakis promised to employ Steffan, Goldfreed allowed Steffan to invest $15,000.00 from his savings account to enter into a partnership with Arajakis to purchase the automobiles, and Arajakis drafted a partnership

agreement. Dated July 7, 1988, and signed by both Arajakis and Steffan, the document read as follows:

This partnership agreement by and between William Arajakis and Steffan Goldfreed is entered into on the 7th day of July 1988. The purpose of the partnership is to buy, restore and sell classic and other automobiles with the intent of making a profit. The initial stock will consist of a 1963 Mercedes Benz 220 SE Coupe and a 1960 Rolls-Royce Silver Cloud. The profits of this partnership shall be divided equally between William Arajakis and Steffan Goldfreed.

Steffan and Goldfreed gave Arajakis a cashier's check for $15,000.00.

Shortly after this agreement was signed, Goldfreed agreed to purchase a 1985 Chrysler Fifth Avenue from Arajakis for $5,725.00 and to pay $954.85 to ship the vehicle to her older son in Chicago. When Goldfreed took Steffan to see the Chrysler, Arajakis told her that he had shipped the car on Caravan Nationwide. At trial, however, Dan Holloway, the custodian of records for the Nevada Department of Motor Vehicles, testified that his department had no record of the existence of Caravan Nationwide, and that Arajakis did not have a license to sell automobiles in Nevada.

In September, 1988, approximately one month after paying Arajakis for the Chrysler, Goldfreed began asking Arajakis to return her son's $15,000.00. In October, she went to the police. Shortly thereafter, Arajakis told her that in a month he would pay her $5,000.00. The Goldfreeds never received the money or the papers to either of the cars. Later, Goldfreed learned that a Mr. Mullen owned the Rolls-Royce and that Cashman Cadillac owned the Chrysler.

On November 13, 1989, the State filed an information that charged Arajakis with embezzlement and grand larceny. The State subsequently filed a supplemental information on March 8, 1990, which included a habitual criminal allegation. A jury trial was conducted on May 14 and 15, 1990. At his request, Arajakis represented himself. The jury returned a guilty verdict on two embezzlement charges. At the sentencing hearing on June 27, 1990, about one and one-half months after the verdict, Arajakis asked the district court to appoint counsel for him. The district court refused, stating that Arajakis had waived this right when he elected to proceed in proper person. The district court stated, "The court canvas[s]ed you in this matter and I believe that your waiver is waived for all of these proceedings and I think we covered that as part of the canvas[s]." The Department of Probation and Parole recommended an eight-year sentence on each

count, to run consecutive to one another. The district court proceeded to sentence Arajakis under the habitual criminal statute to two consecutive life sentences without the possibility of parole, $21,679.85 in restitution, an $8,000.00 fine, and a $20.00 administrative assessment. Arajakis filed a notice of appeal in proper person on July 12, 1990. On February 5, 1991, the district court appointed counsel for Arajakis's appeal.

## Discussion

The justice court denied Arajakis's application to proceed in proper person and appointed the public defender to represent Arajakis at the preliminary hearing. At the arraignment on November 15, 1989, the public defender represented Arajakis. However, Arajakis, dissatisfied with his attorney's performance at the preliminary hearing, stated that the public defender would no longer represent him. Arajakis filed a request for substitution of attorney on January 3, 1990, substituting himself for the public defender, who filed a motion to withdraw. The court questioned Arajakis about proceeding in proper person. At a hearing on January 17, 1990, the prosecutor informed the district court that the justice court judge had doubted Arajakis's ability to defend himself. Arajakis stated that one of his reasons for self-representation was that his only communication with the public defender had been to answer ten questions. Arajakis claimed that when he had asked a question, he was told to "shut up" and answer the questions. However, the court observed at the preliminary hearing that Arajakis had refused to let the public defender interview him, and the public defender stated before trial that Arajakis had not co-operated with him.

A canvass on January 22, 1990, revealed the State's intent to seek habitual criminal punishment. Arajakis signed a *Faretta* form, which showed that he understood the consequences of waiving his right to counsel under guidelines established by the United States Supreme Court in Faretta v. California, 422 U.S. 806 (1975). From that date until counsel was appointed for this appeal on February 5, 1991, Arajakis proceeded in proper person without standby counsel. The district court denied his last-minute request at the sentencing hearing for a continuance to obtain counsel.

Arajakis argues that his waiver of counsel was not intelligently and voluntarily made subsequent to a comprehensive and penetrating canvass. He contends that the court's canvass was inadequate and that because his self-representation was ineffective, he has been denied his constitutional right to effective representation.

The United States Supreme Court has held that the State may not "compel a defendant to accept a lawyer he does not want." *Faretta,* 422 U.S. at 833. *See* U.S. Const. amend. VI; Nev. Const. art. 1, § 8; *see also* Baker v. State, 97 Nev. 634, 637 P.2d 1217 (1981). The purpose of a canvass is to ascertain whether the defendant understands the consequences of his decision to proceed without counsel. *Faretta* addressed the instance where the defendant waived his right to counsel, represented himself at trial, and then argued he had ineffective assistance of counsel. In *Faretta,* the court stated:

> Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

*Faretta,* 422 U.S. at 835 n.46. *See* Hollis v. State, 95 Nev. 664, 665, 601 P.2d 62, 63 (1979).

While *Faretta* requires that the accused understand the dangers and disadvantages of self-representation, it does not require the trial court to explain the elements of the charged offense or possible defenses. In People v. Bloom, 774 P.2d 698 (Cal. 1989), *cert. denied,* 449 U.S. 1039 (1990), the court stated:

> The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.

*Id.* at 716. *See* Wayne v. State, 100 Nev. 582, 691 P.2d 414 (1984); *see also* People v. Salazar, 141 Cal.Rptr. 753, 761 (1977) ("the right . . . to represent oneself is guaranteed not because it is essential to a fair trial but because the defendant has a personal right to be a fool").

Both the justice court, at the preliminary hearing, and the district court, before the trial, canvassed Arajakis and advised him about the habitual criminal punishment which the State was seeking. The *Faretta* form that Arajakis signed contained a sentence which stated that he could not claim after trial that he did not have adequate representation of counsel. We conclude that Arajakis's choice of self-representation was made knowingly and intelligently, and that he elected to exercise his constitutional right to represent himself despite the trial court's warnings, under the criteria set forth in *Faretta,* that self-representation could impair the presentation of his case. We therefore conclude that Arajakis's post-conviction claims of an inadequate canvass and ineffective assistance of counsel lack merit.

Arajakis also argues that because he was deprived of his constitutional right to counsel at sentencing, the enhanced penalty for habitual criminal status is void. The jury returned the guilty verdict on May 15, 1990. At the sentencing hearing, on June 27, 1990, about one and one-half months after the verdict, Arajakis for the first time requested that the court appoint counsel on his behalf. Stating that Arajakis had waived this right for all proceedings when he elected to proceed on his own behalf, the district court denied the request.

Prior Nevada cases have established guidelines regarding the right to self-representation. In Ross v. State, 97 Nev. 40, 623 P.2d 980 (1981), the defendants waived their right to representation by counsel. One month prior to the date set for trial, they retracted their waivers and requested that counsel be appointed. This court held that under those circumstances the district court had no discretion to refuse the appointment of counsel. We further noted: "We need not decide at what point the district court would have discretion to refuse to appoint counsel when a defendant seeks to terminate his *propria persona* status." *Id.* at 42, 623 P.2d at 981. In Baker v. State, 97 Nev. 634, 637 P.2d 1217 (1981), we stated that "a defendant may not be permitted to employ a delaying tactic by abuse of this rule [of the right to self-representation]." *Id.* at 636, 637 P.2d at 1218. In Lyons v. State, 106 Nev. 438, 796 P.2d 210 (1990), we observed that a request for self-representation may be denied upon "a showing of dilatory intent." *Id.* at 444, 796 P.2d at 214. We further stated:

> [A] district court should be permitted, in its discretion, to deny a request for self-representation on the ground of untimeliness alone, if the request is not made within a reasonable time before commencement of trial or hearing and there is no showing of reasonable cause for the lateness of the request. . . . There need not be a specific finding of dilatory intent, which is a separate and distinct basis for denial of the request. The district courts should set forth in the record the reasons for denying a defendant's request to represent himself.

*Id.* at 445-46, 796 P.2d at 214-15.

In a California case, People v. Hamilton, 753 P.2d 1109 (Cal. 1988) (en banc), the defendant was tried for murder. After the jury returned its verdicts in the guilt phase, the defendant moved to represent himself during the penalty phase. The trial court refused, and the California Supreme Court upheld the ruling, stating:

> [T]he court's denial of the motion in question was not error.

> Because defendant's request was filed in the midst of the jury's guilt phase deliberations, it was not timely for purposes of invoking an absolute right of self-representation under *[Faretta]*. Accordingly, it was within the court's discretion to grant the request or not.

*Id.* at 1120-21 (citations omitted).

The facts in *Baker, Lyons,* and *Hamilton* are the converse of the circumstances in the instant case because Arajakis requested counsel after having waived his right to counsel and proceeded to represent himself. However, the analysis is no different because in both cases the question is whether the defendant has made a voluntary, intelligent, and timely decision to change the nature of his representation. Faretta v. California, 422 U.S. 806 (1975); Block v. State, 95 Nev. 933, 604 P.2d 338 (1979). Despite the district court's admonishment, Arajakis elected to represent himself in all of the proceedings. He signed a statement that he understood the State was pursuing habitual criminal charges which permit the imposition of a life sentence without the possibility of parole. More than five weeks after the jury verdict, for the first time he asked the district court to retract his waiver of counsel. We conclude that Arajakis failed to act with sufficient diligence when he requested counsel for his sentencing on the day of the sentencing hearing, almost one and one-half months after the conclusion of the trial, and that therefore the district court acted within its discretion when it denied his motion for a continuance to obtain counsel.

Next, Arajakis argues that the records of his California, Texas, and Colorado convictions were invalid and that the district court should not have utilized them in finding that he was a habitual criminal because "[t]he burden is upon the state to prove that, in the prior criminal proceedings, an attorney was either present or that the defendant validly waived his right to counsel." Cohen v. State, 97 Nev. 166, 169, 625 P.2d 1170, 1172 (1981). Arajakis contends that the State's failure to demonstrate that he was either represented by counsel or validly waived his right to counsel should have precluded the trial court from considering the aforementioned convictions. Arajakis, however, did not object to the use of these convictions at the sentencing hearing. Furthermore, during his allocution statement, Arajakis acknowledged that he had three prior convictions, including one conviction for a violation of the Dyer Act (National Motor Vehicle Theft Act).

NRS 207.010(6) states, in pertinent part, that:

> If a defendant charged under this section is found guilty of . . . the primary offense, *but denies any previous conviction*

*charged,* the court shall determine the issue of the previous conviction after hearing all relevant evidence presented on the issue by the prosecution and the defendant.

(Emphasis added.) "[A]n unexcused failure to object in the trial court to the State's failure to make an affirmative showing of the validity of the prior convictions relied upon to enhance a penalty under NRS 207.010 preclude[s] the raising of this objection for the first time on appeal." Baymon v. State, 94 Nev. 370, 372, 580 P.2d 943, 944 (1978). *See* Halbower v. State, 96 Nev. 210, 606 P.2d 536 (1980); Thomas v. State, 93 Nev. 565, 571 P.2d 113 (1977). Because Arajakis admitted his previous convictions, we conclude that his contentions as to the invalidity of the prior convictions are meritless. Furthermore, even if he had not admitted to his prior convictions, the exhibits reveal that Arajakis either had counsel or represented himself after a knowing and intelligent waiver. Because Arajakis admitted to his previous convictions and because the State's exhibits show that in his prior convictions Arajakis was represented by counsel or validly waived the right to counsel, we conclude that Arajakis's contention lacks merit.

Arajakis next argues that even if these were valid convictions, they were for nonviolent crimes and were remote, and therefore the enhanced penalty was an abuse of discretion. NRS 207.010(1) provides the statutory definition of a habitual criminal as follows:

> Every person convicted in this state of any crime of which fraud or intent to defraud is an element, or of petit larceny, or of any felony, who has previously been twice convicted, whether in this state or elsewhere, of any crime which under the laws of the situs of the crime or of this state would amount to a felony, or who has previously been three times convicted, whether in this state or elsewhere, of petit larceny, or of any misdemeanor or gross misdemeanor of which fraud or intent to defraud is an element, is an habitual criminal and shall be punished by imprisonment in the state prison for not less than 10 years nor more than 20 years.

NRS 207.010 makes no special allowance for non-violent crimes or for the remoteness of convictions; instead, these are considerations within the discretion of the district court. French v. State, 98 Nev. 235, 645 P.2d 440 (1982). In Sims v. State, 107 Nev. 438, 814 P.2d 63 (1991), this court upheld the trial court's decision to impose a life sentence without the possibility of parole under the habitual criminal statute. The defendant was convicted of grand larceny for the unlawful taking of a purse and wallet

containing $476.00. The trial court, at sentencing, found that the defendant was a habitual criminal and imposed a sentence of life imprisonment without the possibility of parole. This court recognized that although it may disagree with the district court's determination, "we deem it presumptively improper for this court to superimpose its own views on sentences of incarceration lawfully pronounced by our sentencing judges." *Id.* at 440, 814 P.2d at 64. Arajakis's prior convictions all involved some degree of fraud. State's Exhibit 1 showed a conviction for embezzlement. State's Exhibit 2, besides showing a Texas conviction in 1977 for theft and theft of an automobile, reflects that Arajakis violated probation and failed to pay a fee and full restitution. State's Exhibit 3 also shows a felony conviction for auto theft. During his sentencing, Arajakis admitted to his previous convictions. The record also shows that he served time in a federal prison in Michigan for auto theft. Because the evidence shows that Arajakis is a career criminal who specializes in fraud with motor vehicles, we conclude the district court did not abuse its discretion in imposing consecutive life sentences on Arajakis under the Nevada habitual criminal statute.

Next, Arajakis contends the judgment of embezzlement should be reversed because he was not a fiduciary. He admits that the facts establish a bailment. NRS 205.300(1) provides in part:

> Any *bailee* of any money . . . who converts it to his own use, with the intent to steal it or to defraud the owner or owners thereof and any agent, manager or clerk of any . . . partnership, or any person with whom any money . . . [shall] have been *deposited or entrusted,* who uses or appropriates the money . . . or any part thereof in any manner or for *any other purpose than that for which they were deposited or entrusted, is guilty of embezzlement.*

(Emphasis added.) NRS 205.300 only requires the State to establish a bailment; it does not require the State to show that an embezzler was a fiduciary.

In reliance on Arajakis's promise to employ her son, Goldfreed allowed her son to invest his savings to buy the classic automobiles. Also, the Goldfreeds gave money to Arajakis based upon his representations that they would become partners, and Goldfreed paid Arajakis the money for the Chrysler. These facts demonstrate that Arajakis was a bailee, "one to whom goods are entrusted." Black's Law Dictionary 141 (6th ed. 1990). He diverted the funds entrusted to him from their intended use, a violation of NRS 205.300(1). Therefore, we conclude that Arajakis's assertion that he had to be a fiduciary is meritless.

Finally, Arajakis contends that his conviction of embezzlement is reversible because the State did not prove he had an intent to steal, and the district court should have instructed the jury that such an intent was an element of the crime. In Rose v. State, 86 Nev. 555, 471 P.2d 262 (1970), this court expanded upon the inference permissible from the act of diversion by stating that:

> The act of diverting carries its built-in intent that speaks for itself, that is, the performance of the act, such as using money of an employer for a reason other than for which it was designated, makes the crime. *Only the intent to do the act, even though not to steal, is important.*

*Id.* at 557, 471 P.2d at 263 (emphasis added). In the instant case, the district court instructed the jury that the diversion of funds from their intended use was sufficient to infer the crime of embezzlement. *See* NRS 205.300(3). We conclude that the jury instruction was correct and that the issue Arajakis raises with respect to his intent to steal lacks merit.

For the reasons set forth above, we hereby affirm the judgment.

Rose, J., with whom SPRINGER, V. C. J., joins, concurring in part and dissenting in part:

I concur with the majority in upholding the jury verdicts returned against Arajakis but believe that because his request for the assistance of counsel at the sentencing hearing was not honored, the sentences should be vacated and a new sentencing hearing held.

A defendant has a right to terminate his self-representation and request the assistance of counsel at any critical stage in a criminal proceeding, and a sentencing hearing is such a critical stage. Beals v. State, 106 Nev. 729, 802 P.2d 2 (1990).

At the beginning of the sentencing hearing, Arajakis requested that an attorney be appointed to assist him. The sentencing hearing was the first time Arajakis returned to court after the verdicts were returned against him at the end of the jury trial. His request for counsel was clear and unequivocal:

> Your Honor, this is a critical point in this proceeding and I've been very inadequate as far as representing myself. I'm talking to a lawyer and trying to get somebody to cover sentencing with me. I have a case in September in No. X and I'm in custody so if we could postpone this long enough that I could get counsel here to represent me.

The district court denied this request because it believed any

waiver of the assistance of counsel made prior to trial was irrevocable for the entire trial and sentencing proceeding, and it could not be withdrawn. This conclusion by the district court was incorrect. The majority believes the denial of counsel to Arajakis at the sentencing hearing can nevertheless be justified by the fact that his request, which came at the beginning of the sentencing hearing, was untimely.

We should reach the same result in this case as we reached in the *Beals* case. In that case, Beals, while represented by counsel, pleaded guilty to a felony. At the sentencing hearing, Beals' attorney sought to withdraw from further representation of Beals because of an alleged conflict of interest, and Beals requested a new attorney. The court refused to grant counsel's motion to withdraw, and the court declined to continue the sentencing hearing. Rather, the court gave Beals the choice of proceeding with his present counsel or representing himself. Faced with this dilemma, Beals chose to represent himself at the sentencing hearing. After Beals was sentenced, he appealed. We reversed the case and remanded it to the district court with instructions to reconsider Beals' motion to withdraw his guilty plea; and we instructed the district court that if Beals were to be sentenced, "the sentencing hearing must likewise comport with Beals' right to be assisted by counsel." *Id.* at 732, 802 P.2d at 4. The request made in *Beals* was similar to the one made in this case by Arajakis, and the result reached should be the same in both cases.

The majority places great reliance on Lyons v. State, 106 Nev. 438, 796 P.2d 210 (1990), but it is misplaced. *Lyons* permits a "request *for* self-representation" to be denied where the request is untimely or is made for improper purposes. *Lyons,* 106 Nev. at 444-46, 796 P.2d at 214-15 (emphasis added). *Lyons* does not address the issue at hand—where a self-represented defendant makes a request for counsel. *Lyons* is further distinguishable because we were dealing with a request for self-representation at the beginning of a complex jury trial rather than a request for counsel at a sentencing hearing. Lyons' jury trial was lengthy, and there were many witnesses subpoenaed to testify. A sentencing hearing is brief and usually no witnesses are called. At Arajakis's sentencing hearing, no witnesses were called and the entire hearing is transcribed on eleven pages; it could not have taken five minutes to conduct.

Sentencing hearings are often continued to accommodate the probation department, which prepares the pre-sentence report and appears at the sentencing, the attorneys involved in the case, or the defendant. A minimum of inconvenience is caused by rescheduling a sentencing hearing. That part of *Lyons* which is relevant to this case is our direction: "[W]e encourage district

courts to accommodate [a defendant's] requests where this can be done without undue disruption or delay." *Id.* at 446, 796 P.2d at 215.

Arajakis asserted a right guaranteed by the United States Constitution, and a minimum of inconvenience would have been caused by continuing the sentencing hearing and appointing counsel for him. I would vacate the harsh sentences imposed in this case and remand to the district court for the appointment of counsel and a new sentencing hearing.