131 Nev., Advance Opinion 58

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

| | |
|---|---|
| TABUTA JOHNSON, A/K/A TABUDAH EUGENE HUMES,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 63737<br><br>FILED<br><br>JUL 3 0 2015 |



TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a sentence and conviction following a jury trial of one count of conspiracy to commit robbery, two counts of robbery, and one count of battery with intent to commit a crime. Eighth Judicial District Court, Clark County; Kathy Hardcastle, Judge, and Carolyn Ellsworth, Judge.[1]

*Affirmed.*

Lambrose Brown and William H. Brown, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Respondent.

---

[1]Johnson was tried before the Honorable District Judge Kathy Hardcastle and sentenced by the Honorable District Judge Carolyn Ellsworth.

15-900827

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

*OPINION*

By the Court, TAO, J.:

Appellant Tabuta Johnson was convicted of various criminal offenses following a trial, during which the jury was permitted to hear testimony regarding an out-of-court "show-up" identification and the victims identified him in court as the perpetrator of the offenses. In the show-up, Johnson was handcuffed, placed in front of a police car, and illuminated with a spotlight to be viewed by witnesses who then identified him as the perpetrator of the crimes. Johnson did not object below but now asks this court to hold that the show-up was improperly conducted in violation of his constitutional due process rights. He also argues for the first time on appeal that he was improperly sentenced as a habitual criminal.

The Nevada Supreme Court has been presented with few opportunities to review the validity of such show-up identifications; the court last visited this area of the law in *Bias v. State*, 105 Nev. 869, 871, 784 P.2d 963, 964-65 (1989), in which it held that a show-up somewhat factually similar to the one in this case was unnecessarily suggestive and therefore improper. Under the particular facts of this case, we conclude that the trial court did not plainly err by admitting the identification testimony into evidence because the identification procedure used was not unnecessarily suggestive and the identification was reliable.

We also conclude that the sentencing court did not plainly err in adjudicating Johnson as a habitual criminal because the record does not demonstrate that the court operated under a misconception of the law

regarding the discretionary nature of a habitual criminal adjudication. Accordingly, we affirm the judgment of conviction and sentence.

## FACTUAL AND PROCEDURAL HISTORY

One evening, Christina Raebel and Albert Valdez were walking to a bar in downtown Las Vegas when they noticed two men, later identified as Johnson and his brother, Varian Humes, following them. Raebel viewed the two men directly as they approached for about "a second and a half" while Valdez saw them through his peripheral vision for "[o]ne second." Suspicious, Raebel moved her purse from her hip to the front of her body with both hands.

Without warning, Humes punched Valdez in the head, causing him to fall to the ground. At the same time, Johnson grabbed Raebel from behind, covering her mouth with one hand and gesturing with the other to indicate he was carrying a firearm. Johnson removed Raebel's purse from her shoulder and pushed her to the ground. Raebel screamed as she fell and Johnson responded by punching her in the face. While both Raebel and Valdez lay helpless on the sidewalk, Humes demanded that Valdez "give [him] everything" and in response Valdez emptied his pockets, throwing his wallet and cell phone on the sidewalk. Valdez's wallet was unique and easily identifiable because it was constructed entirely out of duct tape. Johnson and Humes then tried to escape by running southbound. Raebel was bruised and Valdez was bleeding from a gash in his forehead. The entire incident lasted "about thirty seconds."

Within minutes, police officers from the Las Vegas Metropolitan Police Department (LVMPD) arrived at the scene. Raebel and Valdez told the police they were attacked by two black males about six feet tall, with one slightly taller than the other, and described their

clothing and the direction in which they fled. Based upon those descriptions, the police issued a radio broadcast to search for two black males about six feet tall wearing dark pants and hoodies who ran southbound from the scene, with the "taller male ... wearing a black hooded sweatshirt and the shorter of the males ... wearing a brown sweatshirt." The broadcast also alerted officers to look for a stolen purse, wallet, and other property.

A few moments later, patrolling officers saw Johnson and his brother emerge from an alley two or three blocks south of the crime scene and jaywalk diagonally across an intersection. The other end of the alley was a dead end blocked by a chain-link fence and shrubbery. According to the officers, Johnson was wearing "a dark black sweatshirt with a hood on it and dark jeans," while his brother was wearing "a black sweatshirt but it was faded so it actually looked brown in the light and he was also wearing jeans."[2] Deciding that the duo "match[ed] the description to a tee" and suspicious as to what the two had been doing in a dead-end alley, the officers detained the men for questioning. When they looked in the alley, the officers saw Raebel's purse, car keys, some makeup containers, and Valdez's unique duct-tape wallet scattered on the ground. The officers handcuffed the two men and issued *Miranda* warnings to them. Officers later found Valdez's cell phone in Humes's pocket.

Approximately 20 to 30 minutes after the crime, officers informed Raebel and Valdez that they "found people that matched the

---

[2]At trial, Raebel testified that Johnson wore a "brownish zip up hoodie" with "a pattern on it" and the "hood up." Valdez testified that he recalled Johnson wearing "a grey jacket with red lining like a grid almost."

description" and asked if they wanted to identify them. After agreeing, Raebel and Valdez were separately transported to where Johnson and his brother were held. On the way there, the police asked Raebel and Valdez to state if they recognized the people that would be shown to them, and instructed that "[a] person is just as innocent as they are guilty" and that it was "just as important to free an innocent man" as it was to identify a guilty one. While Raebel and Valdez took turns sitting inside a police car approximately 30 to 60 feet away, officers brought out Johnson and his brother one at a time in handcuffs and shined spotlights on them as they stood in front of another marked patrol car. Raebel and Valdez were separated from each other during this process to prevent them from influencing each other. Raebel immediately recognized both Johnson and his brother and informed the police that she was 100 percent certain they were the two perpetrators. Valdez felt approximately 90 percent certain about Johnson's identity but did not recognize Johnson's brother at all.

Johnson and Humes were charged with one count of conspiracy to commit robbery, two counts of robbery, and one count of battery with intent to commit a crime. Humes would later enter a plea of guilty to various charges, but Johnson chose to proceed to trial.

During the trial, the jury was apprised of the out-of-court "show-up" identification during which Johnson was affirmatively identified as one of the perpetrators by both Raebel and Valdez. Additionally, both Raebel and Valdez testified at trial and identified Johnson in court as one of the perpetrators. The jury convicted Johnson on all counts.

Following trial, the State sought to have Johnson adjudicated as a habitual criminal and submitted certified copies of six judgments of

Court of Appeals
of
Nevada

(O) 1947B

5

conviction reflecting prior felonies.[3] At sentencing, the district court voiced concern about the violence of the crime, the randomness of the victims, and the "escalation of [Johnson's] willingness to go from non-violent crimes to violent crimes." The court adjudicated Johnson a habitual criminal and sentenced him to four sentences of a maximum of 25 years with minimum parole eligibility of 10 years, with two of those sentences to run consecutively.

## ANALYSIS

On appeal, Johnson contends that the show-up identification was conducted in an unnecessarily suggestive and therefore unconstitutional manner, and the trial court should not have admitted either testimony describing the show-up identification or the victims' in-court identification of him during the trial. Johnson also argues that the sentencing court plainly erred in adjudicating him as a habitual criminal.

At trial, Johnson did not object to either the show-up identification or the trial testimony relating to it, nor did he object to his sentence when it was rendered. Consequently, the scope of our review is narrowly limited to determining whether plain error occurred. *See* NRS 178.602. In particular, we examine (1) whether there was error, (2) whether the error was plain or clear, and (3) whether the error affected the defendant's substantial rights. *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). "An error is plain if [it] is so unmistakable that it reveals itself by a casual inspection of the record. At a minimum, the error must be clear under current law, and, normally, the defendant must

_____

[3]Johnson's criminal history mainly consisted of fraud and controlled substances violations.

show that an error was prejudicial in order to establish that it affected substantial rights." *Saletta v. State*, 127 Nev. ___, ___, 254 P.3d 111, 114 (2011) (internal quotation marks and citations omitted).

Under the particular facts of this case, we conclude that neither the trial court nor the sentencing court committed plain error warranting reversal.

*The validity of show-up identification procedures*

When a witness testifies that he knows a particular suspect committed a crime because he personally saw the crime as it occurred and then at a different time and place recognized the suspect to be the same person he previously saw, he is said to have performed an "identification" of the suspect. Witnesses can be asked to identify a suspect either outside of the courtroom prior to the trial during the initial police investigation of the crime, or later during the trial itself (or both). Both in-court and out-of-court identifications can be challenged by the defendant.

Out-of-court pretrial identifications are typically conducted through a number of common methods, including asking the witness if the perpetrator is one of several people lined up together in the same room (commonly called a "physical line-up"); showing the witness an array of facial photographs and asking if the perpetrator is among them (commonly called a "photographic line-up"); or, as in this case, by presenting a single suspect (or a very small group of potential suspects) to the victim soon after a crime is committed and inquiring if that person is the perpetrator (commonly known as a one-on-one "show-up" identification, a "confrontation," or a "field identification").

Whichever method is used, the Due Process Clause of the United States and Nevada Constitutions[4] forbids a criminal prosecution to be based upon any witness's identification that was procured under circumstances that were unnecessarily suggestive and likely to have resulted in a mistake that cannot be repaired. *See Gehrke v. State*, 96 Nev. 581, 583-84, 613 P.2d 1028, 1029 (1980); *Baker v. State*, 88 Nev. 369, 372, 498 P.2d 1310, 1312 (1972). The Constitution prohibits these suggestive and mistaken identifications whether they occurred outside of the courtroom before trial or during a criminal trial itself when a witness identifies the defendant from the witness stand. *See Manson v. Brathwaite*, 432 U.S. 98, 104-07 (1977). Indeed, in some instances, when a witness participated in a pretrial identification procedure that was extremely unreliable, courts have concluded that the witness's memory may have been so contaminated that a later in-court identification of the same suspect may also be precluded. *See generally United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985) ("Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law."). Thus, an in-court identification of the defendant during trial can be challenged in two ways, either because the in-court

---

[4]Nevada's Due Process Clause is textually identical to the federal clause in relevant respects, *see* Nev. Const. art. 1, § 8(5), and the Nevada Supreme Court reads the state clause as coextensive with the federal clause. *See generally Wyman v. State*, 125 Nev. 592, 600, 217 P.3d 572, 578 (2009). "Nevada has historically followed the United States Supreme Court on most, if not all, of its interpretations and applications of the law governing searches and seizures." *State v. Lloyd*, 129 Nev. ___, ___, 312 P.3d 467, 471 (2013) (internal quotation marks omitted).

identification is itself improper, or because it was contaminated by an improper out-of-court identification that occurred before trial.

In the instant case, Raebel and Valdez identified Johnson as the perpetrator in a pretrial show-up. During the trial, Raebel and Valdez described the pretrial show-up and also identified Johnson again in court as the perpetrator. Johnson challenges both the in-court and out-of-court identifications, but only contends that the in-court identification was improper because it was tainted by the prior show-up identification. Therefore, our focus is upon the validity of the out-of-court show-up.

Historically, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, [was] widely condemned" and viewed by courts with deep suspicion. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). The Nevada Supreme Court has held that show-ups are "inherently suggestive because it is apparent that law enforcement officials believe they have caught the offender." *Jones v. State*, 95 Nev. 613, 617, 600 P.2d 247, 250 (1979).

Though frowned upon, such show-up identifications are nonetheless permissible when the "totality of the circumstances" surrounding the identification demonstrate that they are reliable. *Stovall*, 388 U.S. at 302 ("[A] claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it."); *see also Jones*, 95 Nev. at 617, 600 P.2d at 250; *Banks v. State*, 94 Nev. 90, 94-96, 575 P.2d 592, 595-96 (1978). The question is whether the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that due process was denied to the defendant. *Stovall*, 388 U.S. at 302; *Jones*, 95 Nev. at 617, 600 P.2d at 250. If it was not, the witness's identification is admissible during a

criminal trial and the jury may examine its credibility and reliability. *Gehrke*, 96 Nev. at 584, 613 P.2d at 1030.

Even though the Due Process Clause may theoretically bar an overly suggestive identification whether it occurred before trial or during trial, courts review the validity of identifications under different legal standards depending upon when and how they occurred. Because the show-up identification of Johnson in this case occurred outside of court and preceded the filing of any formal charges, our inquiry involves two questions: (1) whether the show-up procedure was unnecessarily suggestive, and (2) whether the identification was nonetheless reliable in spite of any unnecessary suggestiveness in the identification procedure. *Banks*, 94 Nev. at 94, 575 P.2d at 595 (citing *Manson*, 432 U.S. at 98).

We base our answer to both questions upon a review of the totality of the circumstances. *Id.* Those circumstances include examination of any countervailing policy considerations that might justify an otherwise problematic identification, including such factors as the presence or absence of any exigent circumstances, the need to quickly clear any incorrectly detained suspects so that police can continue searching for the true culprit, the freshness of the witness's recollection, and the possibility that memories might start to fade if other procedures were to be employed. *See Bias*, 105 Nev. at 872, 784 P.2d at 965 (holding that show-up was unnecessarily suggestive when no countervailing policy considerations or any exigency existed); *Jones*, 95 Nev. at 617, 600 P.2d at 250 (holding that policy considerations justified on-scene show-up when, under the circumstances, the witness's memory was fresher immediately after the crime and an immediate identification might have exonerated an innocent suspect and freed authorities to continue the investigation). A

COURT OF APPEALS
OF
NEVADA

(O) 1947B

show-up is more likely to be deemed unnecessarily suggestive, and therefore invalid, when countervailing policy considerations are absent. *Jones*, 95 Nev. at 617, 600 P.2d at 250.

*The show-up in this case was not unnecessarily suggestive*

Johnson alleges that the show-up procedures utilized in this case were unnecessarily suggestive, and that no countervailing policy considerations exist to justify the procedures the police chose to employ. Specifically, Johnson contends that because he was wearing handcuffs and spotlighted in front of a marked police car during the show-up, the circumstances strongly implied to Raebel and Valdez that the police had already arrested the perpetrators of the crime based on other evidence, and Raebel and Valdez were therefore implicitly pressured to corroborate the police work already done. Johnson did not object below and raises these arguments for the first time on appeal.

In seeking reversal of his conviction, Johnson relies principally upon *Bias*, 105 Nev. at 871-72, 784 P.2d at 964-65, in which the Nevada Supreme Court held that a show-up was unnecessarily suggestive where the defendant was handcuffed, placed in front of a police car, and illuminated with a spotlight to be viewed by witnesses who then identified him as the perpetrator of the crimes. The show-up was conducted four hours after the crime, under conditions in which no exigency existed. *Id.* at 872, 784 P.2d at 965. The Nevada Supreme Court concluded "that this show-up procedure was unnecessarily suggestive because there were no countervailing policy considerations to justify it." *Id.* The court nonetheless affirmed the conviction because the identification was deemed "sufficiently reliable." *Id.*

In *Gehrke*, approximately 45 minutes after the incident, eyewitnesses were escorted by an officer to the defendant's home where they were told the police had a suspect in mind. 96 Nev. at 584, 613 P.2d at 1030. The police placed the defendant in front of the headlights of a police car. *Id.* The two eyewitnesses "were seated together in the back seat of the police car, where their initial reaction, whether correct or not, could be reinforced." *Id.* at 586, 613 P.2d at 1031 (Mowbray, C.J., concurring). The Nevada Supreme Court concluded that due to the lack of exigent circumstances, the identification procedure was unnecessary. *Id.* at 584, 613 P.2d at 1030.

Determining whether a particular show-up was unnecessarily suggestive turns not on general principles, but rather upon the particular circumstances surrounding the identification. In this case, even though Johnson was handcuffed and spotlighted, several other circumstances demonstrate that the show-up was not unduly suggestive when considered as a whole, and therefore the show-up in this case was unlike those in *Bias* and *Gehrke*. In this case, Raebel and Valdez were specifically cautioned that it was just as important for the show-up to exonerate innocent people as it was to implicate guilty ones. Additionally, during the show-up, Raebel and Valdez were separated and not allowed to talk to each other while they each independently viewed Johnson and his brother. Neither of these circumstances occurred in *Bias* or *Gehrke*. In *Gehrke*, the two eyewitnesses were seated together in the back seat of the car, "where their initial reaction, whether correct or not, could be reinforced." 96 Nev. at 586, 613 P.2d at 1031 (Mowbray, C.J., concurring). Moreover, the witnesses in *Bias* and *Gehrke* were never directed that an important purpose of the show-up was to free the innocent and not merely to blindly

confirm the suspicions of the police whether true or not. Quite to the contrary, in *Gehrke*, the witness was merely told that the police "had a suspect in mind," and no other instructions were given. 96 Nev. at 584, 613 P.2d at 1030. In *Bias*, the witness was simply asked "if the black guy was the one." 105 Nev. at 870, 784 P.2d at 964. In contrast, the circumstances of the instant case reflect that the police took substantial steps to ensure that Raebel and Valdez were not unduly pressured into a false or mistaken identification.[5]

Even if the show-up contained elements of suggestiveness, strong countervailing policy considerations existed in this case that justified the officers' decision to attempt a show-up rather than another form of identification. The show-up was conducted within half an hour of the crime, while the victims' memories were still fresh. The crime was violent and occurred in the open on the streets of Las Vegas; had the police mistakenly detained the wrong people and employed a more time-consuming method of identification before clearing the suspects and resuming their search, the true criminals could have committed additional

---

[5]Various federal cases have held that show-up identification procedures similar to the one employed in this case were not improper. *See United States v. Drake*, 543 F.3d 1080, 1088-89 (9th Cir. 2008) (holding that show-up was not unnecessarily suggestive, although the robbery occurred in less than one minute, the police officers informed the victim "that they had captured the suspect," and the defendant was handcuffed and surrounded by officers); *United States v. Bagley*, 772 F.2d 482, 492-93 (9th Cir. 1985) (holding that show-up was not unnecessarily suggestive, although the witness viewed the defendant seated in a police car, handcuffed, and surrounded by officers); *United States v. Kessler*, 692 F.2d 584, 586 (9th Cir. 1982) (explaining that "[t]he use of handcuffs or other indicia of custody" does not automatically invalidate a show-up).

violent offenses against other unsuspecting victims in the meantime or escaped apprehension entirely. Furthermore, Johnson suggested he had a firearm during the robbery. While no firearm was ultimately recovered, his claim to have had one on him underscored the need to find him quickly before he could endanger other victims. Thus, the decision to employ a show-up rather than another more onerous method of identification was warranted under the exigencies that existed in this case.

Therefore, we conclude that the confrontation in this case was not unnecessarily suggestive, and any suggestiveness that might have existed was counterbalanced by important policy considerations justifying the show-up.

*The identification was reliable*

Even if the procedures employed here could be said to have been suggestive, suggestiveness by itself does not necessarily preclude the use of identification testimony at trial if the identification was otherwise reliable. *Bias*, 105 Nev. at 872, 784 P.2d at 965. In fact, when assessing admissibility, reliability rather than suggestiveness is the main concern. *Jones*, 95 Nev. at 617, 600 P.2d at 250. Reliability is measured by: (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the degree of attention paid by the witness, (3) the accuracy of the witness's prior description, (4) the level of the witness's certainty demonstrated at the confrontation, and (5) the length of time between the crime and confrontation. *Canada v. State*, 104 Nev. 288, 294, 756 P.2d 552, 555 (1988) (quoting *Manson*, 432 U.S. at 114).

Here, Raebel testified that she had a clear opportunity to view the two suspects for about a second-and-a-half as they approached her prior to the crime, and paid special attention because she sensed danger.

 

She then remained in close physical proximity to her assailants for another 30 seconds as the assault took place. Valdez testified that, prior to the crime, he only viewed the suspects for a second through his peripheral vision, but had more opportunity to see them as they assaulted him over the next 30 seconds. Raebel and Valdez were in close proximity to their attackers and were asked to conduct the show-up within about 30 minutes after the crime while the incident was still fresh in their minds. At the show-up, Raebel immediately recognized both suspects with 100 percent certainty. Valdez immediately recognized Johnson with 90 percent certainty.

Moreover, prior to the show-up, Raebel and Valdez accurately described the race, gender, and height of the suspects they later positively identified, and provided descriptions of the color of their clothing accurate enough that, within minutes, the police found suspects who fit the description "to a tee."[6] Raebel and Valdez informed officers that the two

---

[6]Johnson notes that the victims' clothing descriptions appeared to change and became more detailed only after they participated in the show-up. At the scene, the victims told police that the perpetrators wore dark pants and hoodies, one black and the other brown. At trial, Raebel recalled that Johnson wore a "brownish zip up hoodie" with "a pattern on it" and the "hood up." Valdez testified that he recalled Johnson wearing "a grey jacket with red lining like a grid almost." While it is certainly true that notable discrepancies existed, on balance these discrepancies are insufficient to render the identification unreliable when weighed against all of the other facts present in this case. *See Kessler*, 692 F.2d at 586 (explaining that subsequent descriptions that became more "detailed and accurate cannot be used to show impermissible suggestiveness" because "one of the central and legitimate purposes of a show-up is to sharpen the recollections of eyewitnesses and to enable them to focus attention on details they may have otherwise overlooked"). *See also United States v. Brown*, 636 F. Supp. 2d 1116, 1127 (D. Nev. 2009) (holding that

*continued on next page...*

perpetrators fled south on foot, and police found Johnson and Humes minutes later on foot two or three blocks immediately south of the crime scene disposing of the victims' property. Additionally, Valdez's cell phone was discovered in Humes's pocket.

Under these circumstances, we conclude that the identification of Johnson, both in court and during the pretrial show-up, was reliable and not mistaken. *See Bias*, 105 Nev. at 872, 784 P.2d at 965 (holding that show-up not inadmissible when the victim was certain that the defendant was the assailant and recognized the defendant's features and clothing, as well as the weapon found at the scene of the show-up); *see also United States v. Gregory*, 891 F.2d 732, 734-35 (9th Cir. 1989) (holding that identification was reliable when the witnesses viewed the robber for approximately 30 seconds and described the assailant to police officers soon after the robbery); *United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir. 1983) (explaining that the witness's "degree of attention was undoubtedly high" because she was the victim of the robbery). Consequently, we conclude that the district court did not commit plain error when it permitted the jury to hear testimony regarding the victims' identification of Johnson both before and during trial.

---

*...continued*
identification was reliable, although the witness held a mistaken belief about the color of the assailant's sweatshirt and jeans); *Drake*, 543 F.3d at 1088-89 (holding that identification was reliable, although the victim "significantly underestimated" the defendant's height and the robbery occurred in less than a minute).

*The district court did not plainly err in adjudicating Johnson a habitual criminal*

Johnson argues that the sentencing court improperly adjudicated him as a habitual criminal based only on his perceived escalating violence. Although Johnson did not object when the sentence was rendered, he contends this constituted plain error because the sentencing court impermissibly based its sentence upon only a single consideration rather than the multiplicity of factors on which a proper sentence should be based. Thus, Johnson avers that the district court believed that it was required to apply the habitual sentencing statutes.

Under NRS 207.010, a defendant who has been convicted of at least three felonies qualifies as a habitual criminal. The Nevada Supreme Court has held that a district court has the discretion to sentence a defendant as a habitual offender merely because the defendant was convicted of at least three separate prior felonies. *LaChance v. State*, 130 Nev. ___, ___, 321 P.3d 919, 930 (2014). Nevertheless, a district court may exercise discretion to "dismiss a count under NRS 207.010 when the prior offenses are stale or trivial, or in other circumstances where an adjudication of habitual criminality would not serve the purposes of the statute or the interests of justice." *French v. State*, 98 Nev. 235, 237, 645 P.2d 440, 441 (1982); *see Clark v. State*, 109 Nev. 426, 428, 851 P.2d 426, 427 (1993) (explaining that "[t]he decision to adjudicate a person as a habitual criminal is not an automatic one"). The purpose of the habitual criminality statute is to allow the criminal justice system to deal determinedly with career criminals who seriously threaten public safety. *Sessions v. State*, 106 Nev. 186, 191, 789 P.2d 1242, 1245 (1990).

Adjudication under the habitual criminal statutes entails "the broadest kind of judicial discretion," *Tanksley v. State*, 113 Nev. 997, 1004,

946 P.2d 148, 152 (1997) (internal quotation marks omitted), and the statutes do not include any express limitations on the judge's discretion. *French*, 98 Nev. at 237, 645 P.2d at 441. In reviewing a district court's decision to sentence a defendant under these statutes, we consider the record as a whole and evaluate whether the sentencing court, in fact, exercised its discretion. *O'Neill v. State*, 123 Nev. 9, 16, 153 P.3d 38, 43 (2007). In doing so, no requirement exists that "the sentencing court must utter specific phrases or make particularized findings that it is just and proper to adjudicate a defendant as a habitual criminal." *Hughes v. State*, 116 Nev. 327, 333, 966 P.2d 890, 893 (2000) (internal quotation marks omitted). Moreover, the habitual criminal statute "makes no special allowance for non-violent crimes or for the remoteness of convictions" but rather regards these as "considerations within the discretion of the district court." *Arajakis v. State*, 108 Nev. 976, 983, 843 P.2d 800, 805 (1992). The sentencing court acts properly as long as it does not operate "under a misconception of the law regarding the discretionary nature of a habitual criminal adjudication." *Hughes*, 116 Nev. at 333, 996 P.2d at 893-94.

Here, we conclude that the district court properly exercised its discretion to sentence Johnson as a habitual criminal. The record does not demonstrate that the district court was unaware of the discretion statutorily entrusted to it. While the sentencing court expressed concern over the "escalation of [Johnson's] willingness to go from non-violent crimes to violent crimes," the court never characterized this as the sole basis for adjudicating Johnson as a habitual criminal, nor did the court indicate any belief that habitual criminal adjudication was mandatory or

automatic. The court was not required to utter specific phrases or findings to justify its decision. Taken as a whole, the record does not demonstrate that the district court operated under a misconception of the law regarding the discretionary nature of a habitual criminal adjudication. Thus, the sentencing court did not plainly err in adjudicating Johnson as a habitual criminal.

## CONCLUSION

For the reasons discussed above, we conclude that the trial court did not plainly err in admitting testimony relating to the show-up identification, nor did the sentencing court plainly err in adjudicating Johnson as a habitual criminal. Accordingly, we affirm the judgment of conviction and sentence.

_____, J.
Tao

We concur:

_____, C.J.
Gibbons

_____, J.
Silver

COURT OF APPEALS
OF
NEVADA

(O) 1947B