MELVIN JOSEPH GEARY, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 7775

December 19, 1975                                    544 P.2d 417

*Morgan D. Harris,* Public Defender, and *Michael A. Cherry,* Deputy Public Defender, Clark County, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* District Attorney, and *Dan M. Seaton* and *Frank Cremen,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, BATJER, J.:

A jury found the appellant guilty of murder in the first degree and fixed his penalty at life in prison without the possibility of parole. In this appeal he contends that the trial court erred by (1) admitting evidence of another offense then refusing to grant a mistrial; (2) failing to suppress evidence obtained in the course of an unlawful search and seizure; (3) admitting his involuntary confession; (4) failing to properly instruct the jury on his state of mind; and (5) admitting into evidence a vial of the victim's blood when the chain of evidence was defective.

Midafternoon, February 27, 1973, law enforcement officers in Las Vegas, Nevada, received information appellant had been involved in a robbery and shooting and began searching for him. Their search ended several hours later when they found his name on an apartment mailbox and knocked on the apartment door which he answered.

Upon ascertaining his identity, police officers Emmett Davis and Dale Davis stepped into the apartment, made a pat down search of appellant, and then pushed him outside into the custody of a fellow officer. At that moment the officers, from their position at the door of appellant's apartment, observed an overturned lamp and a large reddish-brown spot appearing to be blood on the carpet and which was partly covered by a throw rug. Upon this observation the officers went through the apartment where they found more blood, bloody clothing and bedding. Shortly thereafter they called for assistance from skilled investigators who made a more thorough search of the premises

and gathered articles of evidence including a knife from the kitchen counter.

Later that day appellant was given the "Miranda"[1] warnings by two detectives, and he signed a "rights of persons arrested card" before they questioned him about the large amount of blood found in his apartment. During the interrogation appellant told the two detectives he had at one time been hit by a truck and had blackouts and needed help. They suggested that he would be entitled to have an attorney appointed to represent him and that an application could be made for assistance for mental problems. On February 28, 1973, appellant, after again being advised of his constitutional rights, waiving those rights orally, and signing another "rights of persons arrested card," confessed to the killing of Annette Morris, whose body containing multiple throat and chest wounds had been discovered February 26, 1973, beneath a pile of trash and rubbish in the desert. The confession was videotaped and later played for the jury during the trial.

1.   At the trial, officer Dale Davis testified that on February 27, 1973, at about 7:45 p.m., he arrested appellant on "another incident." Appellant's counsel immediately interrupted the testimony and moved for a mistrial. After a hearing outside the presence of the jury, appellant's motion was denied. The trial judge later offered to admonish the jury and give a limiting instruction, and respondent requested an admonishment, but counsel for appellant indicated that he felt an admonishment would be more prejudicial to his client than the officer's remark and opposed the request. In light of the record we reject appellant's contention on appeal that the trial judge was required to *sua sponte* give the admonishment.

Appellant's claim that evidence of criminal activity unrelated to the offense charged was erroneously admitted is answered in Founts v. State, 87 Nev. 165, 483 P.2d 654 (1971). Founts was indicted for a robbery committed in September of 1969. The victim testified before the grand jury that Founts had also robbed him in April of 1969. At trial, the prosecuting attorney referred to the April meeting between Founts and the victim as an "unfortunate confrontation" and characterized the circumstances as "highly unusual." No reference was made to the

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

details of the meeting. On appeal Founts contended that the trial court erred in allowing into evidence the testimony regarding the April offense. In affirming the conviction, we said: "Though the prosecution repeatedly referred to the 'unusual' or 'unfortunate' nature of the April meeting, nowhere in the course of the examination of Mr. Keough [victim] did it elicit a description of the offense which occurred. Therefore, no damaging previous-offense testimony was introduced and the rule proscribing the introduction of such testimony was not violated." 87 Nev. at 168. All the cases relied upon by appellant are distinguishable on their facts. Here, as in *Founts,* "no damaging previous-offense testimony was introduced," and the rule proscribing proof of a distinct independent offense at the trial of a person accused of a crime was not violated. Cf. Martin v. State, 80 Nev. 307, 393 P.2d 141 (1964).

2. The trial court did not commit error in refusing to suppress the physical evidence discovered during the warrantless search of appellant's apartment and his confession given during a police inquiry.

The Fourth Amendment to the United States Constitution guarantees the individual's "privacy against arbitrary intrusion by the police." Wolf v. Colorado, 338 U.S. 25, 27 (1949); see Mapp v. Ohio, 367 U.S. 643 (1961). Subject to a few specifically established and well-delineated exceptions warrantless police invasions of personal privacy "are *per se* unreasonable under the Fourth Amendment." Katz v. United States, 389 U.S. 347, 357 (1967). One of the recognized exceptions to the search warrant requirement of the Fourth Amendment is the "emergency doctrine." State v. Hardin, 90 Nev. 10, 518 P.2d 151 (1974).

Here the police officers making a valid arrest in connection with an unrelated matter and being lawfully on the premises observed in "plain view"[2] what they recognized to be a large spot of blood on the apartment floor. The appellant was not bleeding. A wounded person in need of assistance might well have been on the premises. At that moment an emergency situation arose which made an immediate search of the apartment imperative. Not only did the officers have a right to immediately

---

[2]Plain view alone is not enough, there must be exigent circumstances to justify a warrantless entry and seizure, and the discovery must be inadvertent. Coolidge v. New Hampshire, 403 U.S. 443 (1971).

search, but more importantly, a duty and obligation.[3] State v. Hardin, supra. The state had the burden of proving that a warrantless search and seizure was proper. State v. Hardin, supra. That burden has been adequately met.

When an exigency gives rise to a search it may be carried through to its completion in whatever area law enforcement officers may reasonably expect to find the object of their search.

Having had his interest of privacy in the apartment validly invaded and being in custody elsewhere, appellant cannot recapture that interest by a temporary break in the search between the time the police officers made the initial search and the investigators gathered the articles of evidence.[4] Wimberly v.

[3]In State v. Hardin, supra, we quoted with approval from E. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buff.L.Rev. 419, 426–427 (1973):

"Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises, they inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without a warrant."

[4]Compare Scott v. State, 86 Nev. 145, 465 P.2d 620 (1970). Scott was charged with two separate robberies, and his automobile was searched incident to his arrest, then a second time pursuant to a warrant. Neither search turned up incriminating evidence. Three days after his arrest the car was searched again, this time without a warrant, to determine whether it had been stolen. During that search the gun used in the robberies and some money taken in one of the robberies was located. Scott was convicted in separate trials of two robberies. Upon appeal a majority of this court held that the admission of the gun was harmless error in the case where Scott did not testify and a positive indentification of him as the robber was corroborated. However, in the other case we held that the gun and the money taken from Scott's automobile while in police custody, three days after his arrest, during a search without a warrant or consent were products of an illegal search and seizure, and reversed. After Scott was imprisoned on the conviction which we affirmed he petitioned for habeas corpus to the United States District Court for the District of Nevada, and it was denied. In affirming that denial United States Court of Appeals, Ninth Circuit, said: " . . . [W]e reject the contention that the final search of the car (the car had been previously under the control of Scott) was improper. We think that the

Superior Court, County of San Bernardino, 119 Cal.Rptr. 514 (Cal.App. 1975); Bailey v. State, 294 A.2d 123 (Md.App. 1972).

Upon the ground that it was not properly connected to him appellant contends that the knife seized from the counter in his kitchen was improperly admitted into evidence.[5] Items offered in evidence have relevancy and materiality if they are connected with the perpetrator, the victim or the crime. State v. Iddings, 485 P.2d 631 (Wash.App. 1971); Lofton v. People, 450 P.2d 638 (Colo. 1969); State v. Mays, 436 P.2d 482 (Ariz.App. 1968).

In Alsup v. State, 87 Nev. 500, 501–502, 489 P.2d 679 (1971), we said: "When the evidence on the part of the prosecution is circumstantial an implement by means of which it is likely that a crime was committed is admissible in evidence if it has been connected with the defendant."

Here a pathologist testified to the numerous wounds suffered by the victim and indicated that the subject knife was the type of weapon that could have inflicted those wounds. Appellant, in his videotaped confession, admitted stabbing the victim with a boning knife, and a criminalist testified that blood was found on the knife.

Connected to the appellant, the victim and the crime, the knife was properly admitted into evidence by the trial court.

3. Relying on the contention that the detectives promised him psychological help in exchange for his confession to murder, appellant argues that his confession was not freely and vountarily given. The record does not support his contention but does indicate that appellant had been injured some years before in a traffic accident and, by his own testimony, suffered "blackouts."

If a defendant is mentally capable of understanding the

---

search was perhaps an administrative search, proper as such and not too untimely. *It also would appear that the last search (which was a re-search) was proper under the warrant issued a few days before."* Scott v. Hocker, 460 F.2d 303 (9th Cir. 1972). [Emphasis added.]

[5]For the first time, during argument on this appeal appellant has claimed the knife should have been suppressed as evidence because it was not seized by the police officers making the initial search of his apartment, but by an investigator making a later search. This contention is met by our holding, supra, that a search validly commenced may be *reasonably carried through to its conclusion.*

meaning and consequences of his confession, his mentally disturbed condition does not preclude its admission. Criswell v. State, 86 Nev. 573, 472 P.2d 342 (1970), cert. denied, 400 U.S. 946 (1970). This record reveals no adverse mental or physical condition on the part of the appellant which would impair his understanding of the meaning and consequence of his confession, nor any oppressive or coercive act or pressure on the part of the law enforcement officers which would render the confession inadmissible.

4. Appellant next contends there was a possibility that he might have been found guilty in a lesser degree if his proposed instruction on the "state of mind" issue had been given in conjunction with Instruction No. 22,[6] which was given, and as a result the trial court erred in its refusal. We do not agree.

In Fox v. State, 73 Nev. 241, 247, 316 P.2d 924 (1957), this court in holding that it was not error for the district court to refuse to give the instruction offered, said: "We are here concerned with two separate factual issues. (1) Was the mind of the defendant capable of premeditating? This is the 'capacity' issue upon which we have, earlier in this opinion, rejected the doctrine of partial responsibility. (2) Assuming that the defendant was capable of premeditating, did he in fact premeditate? This is the 'state-of-mind' issue. Upon this issue all material evidence may be considered—evidence of what the California court has referred to as 'tensions', including the evidence of mental disorder. But *all* evidence *must* be taken into consideration. And it must show something more than mental disorder. If evidence of mental disorder alone is to preclude premeditation it must be such as affects capacity. Otherwise we have by circuitous reasoning placed upon the State the burden of disproving mental disorder beyond a reasonble doubt. Upon the state-of-mind issue it is the tensional circumstances of the case viewed in the light of the evidence of mental disorder which are the proper concern of the jury. The issue is whether those circumstances, so viewed, raised reasonable doubt that the mind, although capable of premeditating, did in fact premeditate.

---

[6]Instruction No. 22, as given, reads: "Evidence of an abnormal mental condition not amounting to insanity which tends to prove that the defendant did not, in fact, entertain the specific intent or state of mind at the time of the act, which is by definition a requisite element of the crime charged, should be considered for the purpose of determining whether the crime charged or a lesser degree thereof was, in fact, committed."

"In presenting these issues to the jury they should be carefully differentiated. Otherwise confusion is bound to result for, at best, confusion is implicit in the situation. It will not do, upon the first issue, to present conflicting and confusing instructions which in effect say that although the defendant had mental capacity to premediate, yet the jury in conscientious judgment may find that he had not such capacity.

"The instruction with which we are here concerned was not a 'state-of-mind' instruction, addressing itself to the second issue. Rather, read as a whole, it was a 'capacity' instruction. It confined itself to evidence of capacity and invited a reduction of sentence upon the basis of such evidence alone. To say that 'evidence of insanity * * * may reduce the grade of the offense' is not a true statement of the law. It is a statement of the doctrine of partial responsibility. . . ."

In the light of *Fox* the wording of Instruction No. 22 as given in this case was erroneous in part. It went beyond the "state of mind" issue and advised the jury that an abnormal mental condition not amounting to insanity could not only be considered in determining specific intent but also should be considered for the purpose of determining whether the crime charged or a lesser degree thereof was in fact committed. The latter part of that instruction is a statement of the doctrine of partial responsibility which was specifically rejected by this court in *Fox*. In spite of the fact that the trial court erred in giving that latter part of Instruction 22, it was harmless to appellant because his position was improperly benefitted by that doctrine being available for application to the facts by the jury.

Because the first part of Instruction No. 22 sufficiently instructed on appellant's "state-of-mind" it was not error to refuse his proposed instruction. Jury instructions should be as clear and understandable as possible and should avoid undue repetition. "It is not error to refuse to give an instruction when the law encompassed therein is substantially covered by another instruction given to the jury." Collins v. State, 88 Nev. 168, 170, 494 P.2d 956 (1972). Cf. People v. Bickerstaff, 190 P. 656 (Cal.App. 1920).

5. Finally appellant claims that State's Exhibit No. 32, a vial of the victim's blood, was erroneously received in evidence over his objection because Peter Foote, a mortician, had drawn three (3) vials of blood from the victim and placed them in an evidence envelope, but when State's Exhibit No. 32 was offered,

the other two vials were missing. No contention is made that there is any break in the custody of State's Exhibit No. 32, but a claim that the exhibit is somehow contaminated by the missing vials because tampering could be inferred and therefore the chain of custody was incomplete. We do not follow that line of reasoning.

The custody of the vial of blood labeled State's Exhibit No. 32 was accounted for from the time of its extraction through analysis to introduction. Nothing more is required. No prejudice to appellant is claimed and none is found in the record as a result of the missing vials. Cf. People v. Hitch, 527 P.2d 361 (Cal. 1974). The unexplained loss of the companion vials neither invalidates the exhibit's chain of custody nor precludes its admissibility.

In Sorce v. State, 88 Nev. 350, 352–353, 497 P.2d 902 (1972), we held: "It is not necessary to negate all possibilities of substitution or tampering with an exhibit, nor to trace its custody by placing each custodian upon the stand; it is sufficient to establish only that it is reasonably certain that no tampering or substitution took place, and the doubt, if any, goes to the weight of the evidence. [Citations omitted.]"

The unaccounted-for vials did not affect the fairness of the trial and therefore did not constitute a denial of due process.

The judgment of the district court is affirmed.

GUNDERSON, C. J., and ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.