DENNIS BANKS, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 9809

March 2, 1978                                    575 P.2d 592

*Morgan D. Harris,* Public Defender, and *George E. Franzen,* Deputy Public Defender, Clark County, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* District Attorney, and *H. Leon Simon* and *H. Douglas Clark,* Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury found the appellant, Dennis Banks, guilty of robbery with use of a deadly weapon, and first-degree kidnapping. He seeks reversal, claiming that the district judge erred (1) in failing to suppress testimony predicated upon an out-of-court confrontation between Banks and the victim of the robbery at the time of Banks' arrest and (2) in admitting evidence obtained in a warrantless search of the apartment from which Banks emerged at the scene of his arrest.

### I.

### THE FACTS

On the afternoon when the crimes allegedly occurred, the victim of them, Anthony Silva, picked up four hitchhikers—two Black males and two Black females. One of the males and one of the females joined Silva in the cab of his flatbed truck, while the other two climbed in the rear. After Silva had driven some distance, the male in the front seat pulled a gun and began directing Silva. As Silva later testified: "He said to go straight, that if I didn't he would plug me." Eventually Silva was directed to stop, and to empty his pockets, under a similar threat. The male and female in the front seat took from Silva two knives, two watches, some money, a credit card, and keys, including the key from the ignition. After remaining in the

vicinity of the truck for three or four minutes, the four hitch-hikers left, crossing two open fields and disappearing from Silva's view.

When police arrived minutes later, Silva described the events above and the persons involved, and told police that the hitchhikers had originally mentioned the "Honeymooners" as their destination. Police went directly to the Honeymooners apartments, which they knew to be located approximately 140 yards away in the direction in which the robbers had fled. One of the several persons questioned by police at the apartment complex said that he had seen three individuals matching the description given by the police entering a particular apartment. The police removed people from adjacent apartments, then approached the apartment that had been pointed out. As the officers at the front door knocked and announced their presence, the officer at the rear observed a man, and moments later a woman with a gun, attempting to exit through a window. Both retreated into the apartment at the officer's shouted command. After officers attempted to kick in the front door, a voice from inside indicated that the door would be opened. As the officers waited outside, seven persons—three Black males and four Black females—emerged from the apartment.

After an initial search revealed no weapons among those outside, officers entered and searched the apartment. In the course of their search of the bedroom, police discovered a gun and a knife on the floor of the closet, two watches on a dresser, and a gun magazine under the bed. Silva subsequently identified the watches and the knife as belonging to him, and the gun as that used in the robbery.

From the time that the police had attempted to enter the apartment, Silva had been waiting approximately forty feet away in a police car at the rear of the apartment, where he could hear and observe many of the events described above. He was also aware from the conversations with the officers that they believed they had located the robbers.

Approximately five minutes after arriving at the complex, and some twenty to twenty-five minutes from the time of the robbery, Silva was taken to the front of the apartment, where the seven persons who had emerged were lying face down on the ground. Each of the suspects was asked to stand separately for identification. Banks was the first individual directed to stand; he was immediately identified by Silva as the male in the front seat of the truck. Silva also identified another of the group as the woman in the front of the truck, but was unable to

identify the two passengers in the rear. All seven individuals were then formally arrested and taken to jail.

After a hearing, Banks' pretrial motions to suppress testimony predicated upon Silva's identification at the scene of the arrest, and to suppress the items described above found during the officers' search of the apartment, were denied.[1] On appeal, Banks challenges these determinations of the trial court and the admission of such evidence during trial.

## II.

### THE WITNESS' IDENTIFICATION OF BANKS WAS NOT A DENIAL OF DUE PROCESS.

Since the out-of-court identification of Banks by Silva preceded any formal charges, the case is governed by the standard of Stovall v. Denno, 388 U.S. 293 (1967). Baker v. State, 88 Nev. 369, 498 P.2d 1310 (1972). The test is whether "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that [appellant] was denied due process of law." Stovall v. Denno, 388 U.S. at 301–302. This determination is to be made after a review of the "totality of the circumstances." 388 U.S. at 302.

The United States Supreme Court has recently clarified such a determination. First, the procedure must be shown to be suggestive, and unnecessaey because of lack of emergency or exigent circumstances. Then, if so, the second inquiry is whether, under all the circumstances, the identification is reliable despite an unnecessarily suggestive identification procedure. Manson v. Brathwaite, 432 U.S. 98 (1977). "[R]eliability is the linchpin. . . ." *Id.* at 114.

A review of the circumstances in this case indicates that the identification procedure used was neither so unnecessarily suggestive nor so unreliable as to require exclusion of Silva's testimony regarding his out-of-court identification or his in-court identification of Banks.

A.    *The Procedure Was Not Unnecessarily Suggestive.*

Banks contends that, because Silva was aware that police thought they had the robbers in custody and because Banks was the first one whom police asked to stand for identification,

---

[1]Banks' motion to suppress evidence seized during the search was granted as to items found between the mattress and the springs of the bed, which the trial court determined to be outside the "plain view" of the officers during the legitimate scope of their search.

the procedure was unnecessarily suggestive. This contention is without merit.

Examples of impermissibly suggestive procedures described in United States Supreme Court cases are distinguishable from the instant case. In Foster v. California, 394 U.S. 440, 443 (1968), the Court found a pretrial identification procedure violative of due process when, "In effect, the police repeatedly said to the witness, ' *This* is the man.' " The accused had been presented to the witness in one lineup with two much shorter men, again in a one-to-one confrontation, and a third time in another lineup. Not until the third viewing was the witness able to make a positive identification.

In United States v. Wade, 388 U.S. 218, 233 (1967), the Court gave further examples of impermissibly suggestive lineup procedures, such as presenting a lineup in which all participants except the suspect are known to the witness, or are grossly dissimilar in appearance or clothing, or in which the suspect is pointed out before or during the lineup.

In this case, Banks was immediately identified by Silva at their first confrontation. There is no contention that Banks was grossly dissimilar in appearance from the other two Black males in the group, or that any in the group were previously known to Silva. The only respect in which Banks contends that he was "singled out" was in being asked to stand first. This cannot provide adequate ground for reversal. The police must begin such an identification procedure with someone; any rule that would require or forbid any particular order would become self-defeating.

Even a one-to-one confrontation may be justified when, for example, a witness who is unable to attend a lineup is the only one who can exonerate a suspect, Stovall v. Denno, 388 U.S. 293 (1967), or is on the scene at the time of arrest, Moss v. State, 88 Nev. 19, 492 P.2d 1307 (1972). In Simmons v. United States, 390 U.S. 377 (1968), a photographic identification procedure involving snapshots of the suspect and an associate in various groups was justified when a serious felony had been committed and the suspect was still at large. "It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces." *Id.* at 385.

In this case, Silva was already present at the scene of the arrest and was the only one who could have exonerated Banks. It was imperative for the police to have a prompt determination of whether the robbery suspects had been apprehended or were still at large. "The police are not to be criticized because they

attempted to establish an affirmative identification as promptly as possible." People v. Floyd, 464 P.2d 64 (Cal. 1970).

B.  *The Identification was Reliable.*

Even if the procedure had been unnecessarily suggestive, there would have been no due process violation, since the identification by Silva had sufficient indicia of reliability, measured by the criteria set forth in Manson v. Brathwaite, 432 U.S. 98 (1977).

The factors which must be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* at 114.

In the case at hand, Silva testified that he had "a good look" at Banks and his companion, who were next to Silva for approximately ten minutes in broad daylight. Although Silva's attention may have been on driving during part of that time, he had an opportunity to observe Banks for several minutes after the truck had stopped. Situations involving much less opportunity for observation have been held by this court to constitute the basis for an in-court identification by a witness independent of an irregular out-of-court identification procedure. Riley v. State, 86 Nev. 244, 468 P.2d 11 (1970) (seven-second observation during robbery); Boone v. State, 85 Nev. 450, 456 P.2d 418 (1969) ("one good look" during car chase).

At the confrontation, which took place only twenty to twenty-five minutes after the robbery, Silva identified Banks immediately and without hesitation.

The record supports a finding that Silva's identification of Banks had sufficient indicia of reliability to allow the admission of the pretrial identification as well as the in-court identification of Banks.

### III.

### THE WARRANTLESS SEIZURE OF ITEMS IN PLAIN VIEW DURING THE COURSE OF A SEARCH FOR ADDITIONAL SUSPECTS DID NOT VIOLATE THE FOURTH AMENDMENT.

An established exception to the search warrant requirement of the fourth amendment is the "emergency doctrine". Geary v. State, 91 Nev. 784, 544 P.2d 417 (1975).

"Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, . . . provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either [sic] life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises, they inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without warrant."

*Id.* at 790, 544 P.2d at 421, n. 3, quoting E. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buff.L.Rev. 419, 426–427 (1973).

Police had ample grounds in this case for the belief that urgent action was necessary to investigate and possibly prevent a substantial threat to their own safety as well as that of others in the vicinity. They were in pursuit of suspects involved in an armed robbery, who they had reason to believe had entered the apartment in question. After seven persons had emerged from the apartment, they had no way of knowing, without entering the apartment, whether others remained inside. Furthermore, they had ample reason to believe that anyone remaining inside would have access to a gun, because a woman had been seen with a gun at the rear window, and an initial search had revealed that none of the seven outside was carrying such a weapon. "When policemen . . . are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act [without a warrant] on that information, even if ultimately found erroneous." Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir. 1963) (Burger, J.), quoted in E. Mascolo, *supra* at 429. *See also* People v. Block, 491 P.2d 9 (Cal. 1971).

Banks contends that, despite the exigencies of the situation and the fact that all items admitted into evidence had been in plain view of the officers during the legitimate scope of a search for a possible armed suspect, the search was rendered violative of the fourth amendment because the officers were not shown to have entered without " 'an accompanying intent to either arrest or search.' " Geary v. State, 91 Nev. at 790, 544 P.2d at 421, quoting E. Mascolo, *supra* at 426.

If, as Banks contends, this phrase must be interpreted so as to preclude emergency entries for any investigative purpose,

the exception would swallow the rule. In a case often cited as an example of the "emergency doctrine", Warden v. Hayden, 387 U.S. 294 (1967), the Court specifically held that police, in pursuit of an armed robbery suspect, "acted reasonably when they entered the house and *began to research for* a man of the description they had been given and for weapons which he had used in the robbery or might use against them. . . . Speed here was essential, and only a *thorough search* of the house for persons and weapons could have ensured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298–299 (emphasis added).

There is nothing in the circumstances of this case that suggests a "planned warrantless seizure." Coolidge v. New Hampshire, 403 U.S. 443, 470, n. 26 (1971). As in *Hayden,* the police acted reasonably in their attempt to determine the location of possible suspects, as well as weapons which might be used against them. This was not a situation in which police had had the suspects or the apartment under suspicion or surveillance for any length of time. They simply responded to an emergency situation in a prudent and reasonable manner.

The seizure of the items in plain view by officers conducting a legitimate emergency search for additional suspects was therefore not in violation of the fourth amendment. Since the State has met its burden of showing that the evidence was lawfully obtained, State v. Hardin, 90 Nev. 10, 518 P.2d 151 (1974), the items were properly admitted into evidence.

We conclude, therefore, that the conviction of Banks must be upheld. The out-of-court identification of him was neither unnecessarily suggestive nor conducive to mistaken identification. The seizure of items in plain view during the course of a search for possible additional suspects did not violate the fourth amendment.

Affirmed.

BATJER, C. J., and THOMPSON, GUNDERSON, and MANOUKIAN, JJ., concur.