132 Nev., Advance Opinion 27

IN THE SUPREME COURT OF THE STATE OF NEVADA

DONALD TAYLOR,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 65388

**FILED**

APR 21 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK



Appeal from a judgment of conviction, pursuant to a jury verdict, of burglary while in possession of a firearm, conspiracy to commit robbery, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon. Eighth Judicial District Court, Clark County; David B. Barker, Judge.

*Affirmed.*

Drummond Law Firm and Craig W. Drummond, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Nell E. Christensen, Deputy District Attorney, Clark County,
for Respondent.

_____

BEFORE HARDESTY, SAITTA and PICKERING, JJ.[1]

_____

[1]Subsequent to the oral arguments held in this matter, The Honorable James W. Hardesty, Justice, was administratively assigned to participate in the disposition of this matter in the place and stead of The Honorable Mark Gibbons, Justice. The Honorable James W. Hardesty, Justice, has considered all arguments and briefs in this matter.

SUPREME COURT
OF
NEVADA

(O) 1947A

6/30/16: Corrected per letter to publishers. CJ

16-12414

*OPINION*

By the Court, SAITTA, J.:

This opinion addresses whether the State's warrantless access of historical cell site location data obtained from a cell phone service provider pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d), violates the Fourth Amendment. We hold that it does not because a defendant does not have a reasonable expectation of privacy in this data, as it is a part of business records made, kept, and owned by cell phone providers. Thus, the "specific and articulable facts" standard set forth at 18 U.S.C. § 2703(d) is sufficient to permit the access of historical cell phone information, and probable cause is not required.

This opinion also addresses the alleged violations of appellant Donald Taylor's right to due process of law and his right against self-incrimination, as well as alleged insufficiency of the evidence and cumulative error.

*FACTUAL AND PROCEDURAL HISTORY*

*The robbery-murder*

On November 18, 2010, at approximately 2 p.m., Michael Pearson and his girlfriend's three-year-old son arrived at Angela Chenault's apartment. Chenault is the mother of Pearson's girlfriend, Tyniah Haddon. After taking her grandson to the bedroom, Chenault went to the kitchen, where she cooked while she talked with Pearson. Pearson told Chenault that he was meeting his friends at her apartment. Pearson brought a black bag containing marijuana with him into the apartment and placed it on top of the refrigerator. Chenault saw Pearson sit on the couch and talk to someone on his phone.



At some point, Pearson left the apartment and returned with two men. Chenault never met either of these men before and neither introduced themselves to her. One of the men walked around the apartment and went toward the bedroom. To prevent the man from going inside the bedroom where her grandson was watching television, Chenault stood in front of the bedroom door. She momentarily stood face-to-face with the man. He asked who was in the bedroom, and Chenault replied that her grandson was in there. Chenault noticed that the man was holding a gun. During the trial, Chenault identified that man as Taylor.

Chenault returned to the kitchen stove and resumed cooking. Pearson removed the black bag from the top of the refrigerator and placed it on the kitchen table. He asked for money from the two men in exchange for the black bag, but the men responded, "No, we taking this." Pearson then said, "Take it." Chenault saw the men begin going through Pearson's pockets and saw Pearson attempt to grab a gun on his waistband. During this time, Chenault turned back to the stove. Shots were fired, and when Chenault turned around, she found Pearson lying in a pool of blood and saw that the men had fled with the black bag. Chenault did not observe the actual shooting.

*Incidents leading to Taylor's arrest*

Las Vegas Metropolitan Police Detectives Christopher Bunn and Marty Wildemann responded to the scene of the shooting. After interviewing Chenault, Detective Wildemann interviewed Haddon. Haddon told Detective Wildemann that Pearson was going to sell marijuana to someone that she knew as "D." She also informed Detective Wildemann that she had met "D" at one of Pearson's coworker's houses. Detective Wildemann gave Pearson's cell phone number to the FBI and

asked for their assistance regarding possible contacts that Pearson made just before the murder occurred.

The FBI provided Detective Wildemann with a phone number to which Pearson placed a call shortly before the murder. Homicide detectives then processed the phone number through government records and were able to link it to an individual named Jennifer Archer.

While conducting surveillance on Archer, Detective Wildemann observed Archer exit her vehicle and enter a bar. When Archer returned to her vehicle, she was accompanied by an unknown male. After initiating a traffic stop of Archer's vehicle, Detective Wildemann arrested the male passenger, who identified himself as Taylor. Taylor gave Detective Wildemann his cell phone and cell phone number. Detective Wildemann dialed the phone number given to him by the FBI. Taylor's cell phone rang. Detective Wildemann then contacted Chenault to come and identify Taylor.

*The out-of-court identification procedure*

Detective Wildemann arranged to meet with Chenault and bring her to the parking lot where Taylor was being held to "conduct a one-on-one."[2] The time was 11:45 p.m., and it was "[p]itch black." The lighting conditions were such that Detective Wildemann had to "superimpose a bunch of lighting on [Taylor]" by pulling vehicles around Taylor and lighting up the spot where Taylor was standing with a patrol car spotlight. After explaining the process to Chenault, Detective

---

[2]A one-on-one, or show-up, is a procedure where the police officer brings the witness to the location where the suspect is being held in order to determine whether the witness can make a positive identification of the suspect.

Wildemann drove her about 15 to 20 yards from where Taylor was standing. Detective Wildemann then drove closer so Chenault could see Taylor more clearly.

Chenault told Detective Wildemann that "she [did not] think that that's him; she just [did not] recognize that to be him." Detective Wildemann pulled the vehicle around and asked Chenault again for her thoughts. Chenault told Detective Wildemann that Taylor looked like the man from the apartment, but believed that Taylor was thicker than the man who was at the apartment. Chenault said that Taylor was "just a bigger guy." Detective Wildemann asked Chenault to focus on Taylor's face, and at that point Chenault said, "[I]t looks like him."

After driving Chenault home, Detective Wildemann texted a photograph of Taylor to Haddon. He asked Haddon to tell him if it was a photograph of "D." Haddon immediately responded, "That's D, that's him." Haddon then showed the photograph to Chenault, who told Haddon that the man in the picture was the person who shot Pearson.

*Taylor's indictment and conviction*

On January 14, 2011, a Clark County grand jury indicted Taylor on the following charges: burglary while in possession of a firearm, conspiracy to commit robbery, robbery with the use of a deadly weapon, and murder with the use of a deadly weapon. After a six-day jury trial, the jury returned a verdict of guilty on all four counts. Taylor filed a motion for a new trial, which was denied by the district court. The judgment of conviction was filed on March 7, 2014. This appeal followed.

## DISCUSSION

*The warrantless access and use of Taylor's historical cell phone location data did not violate Taylor's Fourth Amendment rights*

Taylor contends that a person has an objectively reasonable expectation of privacy in the access to and the use of his or her historical cell phone location data. He further contends that his Fourth Amendment rights were violated because the State did not have a warrant for his historical cell phone location data.

*A search warrant is not required to obtain historical cell site location information*

Pursuant to a subpoena under the Stored Communications Act, Sprint-Nextel provided the State with a call-detail record with cell site information for Taylor's phone.[3] The records covered November 11, 2010, through November 18, 2010. Although they do not provide the content of calls or text messages, the records do provide certain information about those communications. For example, the records show various incoming and outgoing calls. They also demonstrate the times and dates of the calls or text messages, along with the duration for each, as well as the location of the cell towers routing the calls.

---

[3]"The [Stored Communications Act] was passed in 1986 as part of the Electronic Communications Privacy Act of 1986" and is contained in 18 U.S.C. §§ 2701-2710. Kyle Malone, *The Fourth Amendment and the Stored Communications Act: Why the Warrantless Gathering of Historical Cell Site Location Information Poses No Threat to Privacy*, 39 Pepp. L. Rev. 701, 716 & n.103 (2013). Section 2703(d) of the Stored Communications Act allows for disclosure of private communications data via court order "if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d) (2012).

Generally, the phone seeks the cell tower emitting the strongest signal, not necessarily the closest tower. This was relevant at trial because the cell phone tower records indicated that a phone call was made using Taylor's phone close to the time of the murder and the Sprint-Nextel cell tower closest to the location of the murder routed the call.

There are two types of cell site location information (CSLI) that law enforcement can acquire from cell phone companies. Kyle Malone, *The Fourth Amendment and the Stored Communications Act: Why the Warrantless Gathering of Historical Cell Site Location Information Poses No Threat to Privacy*, 39 Pepp. L. Rev. 701, 710 (2013). Law enforcement can either obtain records that a company has kept containing CSLI, known as "historical CSLI," or it "can request to view incoming CSLI as it is received from a user's cell phone in 'real time,'" known as "prospective CSLI." *Id.* Generally, courts have held that prospective CSLI requires a warrant before disclosure may be granted. *Id.* However, only a few courts have addressed the issue of whether historical CSLI requires a warrant. *Id.*

> *A warrant is not required under the Fourth Amendment to obtain historical CSLI*

The phone records received by the State were obtained based on the "specific and articulable facts" standard set forth in 18 U.S.C. § 2703(d).[4] Federal appellate courts that have reached this issue appear to agree that this "specific and articulable facts" standard is sufficient for

---

[4]Taylor does not dispute whether the State had "specific and articulable facts" to obtain a subpoena under the Stored Communications Act but, rather, argues that the standard for obtaining historical CSLI should be probable cause.

obtaining phone records. *See In re Application of U.S. for an Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 313 (3d Cir. 2010) (holding that "CSLI from cell phone calls is obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination"); *see also United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (holding that CSLI data may be constitutionally obtained without a warrant); *In re Application of the U.S. for Historical Cell Site Data*, 724 F.3d 600, 612-13 (5th Cir. 2013) (holding the same). However, the circuit courts are not consistent when defining the types of phone records that are obtainable under the "specific and articulable facts" standard.

For example, the United States Court of Appeals for the Third Circuit in *In re Application of United States for an Order Directing Provider of Electronic Communication Service to Disclose Records to Government* held that magistrate judges have discretion to require a warrant for historical CSLI if they determine that the location information sought will implicate the suspect's Fourth Amendment privacy rights. 620 F.3d at 319. In reaching this conclusion, the court rejected the argument that a cell phone user's expectation of privacy is eliminated by the service provider's ability to access that information:

> A cell phone customer has not "voluntarily" shared his location information with a cellular provider in any meaningful way. . . . [I]t is unlikely that cell phone customers are aware that their cell phone providers *collect* and store historical location information. Therefore, [w]hen a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed and there is no indication to the user that making that call will also locate the caller;

Supreme Court
of
Nevada

(O) 1947A

8

when a cell phone user receives a call, he hasn't voluntarily exposed anything at all.

*Id.* at 317-18 (alteration in original) (internal quotations omitted). However, the court also held that "CSLI from cell phone calls is obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination." *Id.* at 313. Judge Tashima's concurrence notes that "the majority . . . appears to contradict its own holding." *Id.* at 320 (Tashima, J., concurring). Therefore, while the court held that a cell phone user does not lose their expectation of privacy simply by making or receiving a call, it is unclear whether the Third Circuit's decision requires the specific-and-articulable-facts standard or the more stringent probable cause standard, which would require a warrant, before historical CSLI can be obtained.

In *In re Application of United States for Historical Cell Site Data*, the United States Court of Appeals for the Fifth Circuit determined that cell phone users, by and large, do not have an expectation of privacy with regard to CSLI, as they are aware that their phones must emit CSLI to cell phone providers in order to receive cell phone service but continue to use their cell phones to place calls and, thus, voluntarily convey CSLI to cell phone providers. 724 F.3d at 612-13. The Fifth Circuit stressed that the telephone company, not the government, collects the cell tower information for a variety of legitimate business purposes. *Id.* at 611-14. The court explained that a cell phone user has no subjective expectation of privacy because: (1) the cell phone user has knowledge that his or her cell phone must send a signal to a nearby cell tower in order to wirelessly connect the call; (2) the signal only happens when a user makes or receives a call; (3) the cell phone user has knowledge that when he or she places or receives a call, there are signals transmitted through the cell phone to the

SUPREME COURT
OF
NEVADA

(O) 1947A

9

nearest cell tower and thus to the service provider; and (4) as such, the cell phone user is aware that he or she is conveying cell tower location information to the service provider and voluntarily does so when using a cell phone for calls. *Id.* at 613-14.

In spite of this, the court's holding is limited. *Id.* at 615. The court only decided the narrow issue of whether § 2703(d) "orders to obtain historical cell site information for specified cell phones at the points at which the user places and terminates a call [were] . . . unconstitutional." *Id.* (emphasis omitted). The court held that § 2703(d) orders are not unconstitutional, thereby allowing for the lesser standard of "specific and articulable facts" in such cases. *Id.* The court did not address

> orders requesting data from all phones that use a tower during a particular interval, orders requesting cell site information for the recipient of a call from the cell phone specified in the order, or orders requesting location information for the duration of the calls or when the phone is idle (assuming the data are available for these periods). Nor do we address situations where the Government surreptitiously installs spyware on a target's phone or otherwise hijacks the phone's GPS, with or without the service provider's help.

*Id.* Therefore, the court's decision implies that the specific-and-articulable-facts standard is sufficient for historical CSLI, to the extent that the information obtained relates to phone calls that were made and/or terminated by the cell phone user specified in the order.[5]

---

[5]The United States Court of Appeals for the Sixth Circuit has also ruled on whether a person has a reasonable expectation of privacy in the data transmitted from a cell phone, thereby requiring a probable cause standard. *United States v. Skinner*, 690 F.3d 772, 777 (6th Cir. 2012). The court's holding implies that the probable cause standard is not

*continued on next page...*

In *United States v. Davis*, the Eleventh Circuit Court of Appeals held that a defendant "ha[s] no reasonable expectation of privacy in business records made, kept, and owned by [his or her cell phone provider]." 785 F.3d 498, 517 (11th Cir. 2015). These records included telephone numbers of calls made by and to the defendant's phone; whether the calls were incoming or outgoing; the date, time, and duration of the calls; as well as historical cell site location information. *Id.* at 503. The court noted that historical cell site location information reveals the precise location of the cell phone towers that route the calls made by a person but do not reveal the precise location of the cell phone or the cell phone user. *Id.* at 504. The court rejected the argument that cell phone users retain an expectation of privacy in the data because they do not voluntarily convey their location information to the service provider. *Id.* at 517. The court also held that "[t]he stored telephone records produced in this case, and in many other criminal cases, serve compelling governmental interests." *Id.* at 518.

Thus, while federal courts generally agree that probable cause is not necessary for obtaining a cell phone user's historical CSLI, the information that can be obtained without probable cause does vary from circuit to circuit. The position taken by the Eleventh Circuit Court of Appeals is persuasive, and we hold that the "specific and articulable facts" standard under § 2703(d) is sufficient to obtain historical cell phone information because a defendant has no reasonable expectation of privacy

---

*...continued*
required for a cell phone user's CSLI, at least where the cell phone user is on a public thoroughfare. *Id.* at 781.

SUPREME COURT
OF
NEVADA

(O) 1947A

in business records made, kept, and owned by his or her cell phone provider.

### Taylor's Fourth Amendment rights were not violated

Here, the police obtained a § 2703(d) order by meeting the "specific and articulable facts" standard. The order allowed them to obtain Taylor's historical CSLI, including his location—within 2.5 miles of the murder scene—at the time he placed a call, shortly before the murder occurred, and the call and text message records between his and Pearson's cell phones leading up to the robbery-murder. Because Taylor does not have a reasonable expectation of privacy in business records made, kept, and owned by his provider, Sprint-Nextel, a warrant requiring probable cause was not required before obtaining that information. Thus, we hold that Taylor's Fourth Amendment rights were not violated.

### The out-of-court and in-court identifications did not violate Taylor's constitutional right to due process of law

Taylor challenges Chenault's identification of him during the show-up as the person in her apartment during the crime, as well as her positive identification of Taylor during trial.[6]

---

[6]Although Taylor alludes to the impropriety of the photograph that was sent to Haddon, he fails to argue in his appellate briefing that the single photograph was unnecessarily suggestive and unreliable. Although an argument can be made that the photograph was unnecessarily suggestive and unreliable because Chenault was shown a single photograph by her daughter that had been sent via text by Detective Wildemann, see In re Anthony T., 169 Cal. Rptr. 120, 123 (Ct. App. 1980) ("[I]f appellant was wrongfully identified and convicted it matters not to him whether the injustice was due to the actions of the private citizens or the police."), Taylor does not cogently argue this claim or provide relevant authority in support of it. Therefore, we need not reach the merits of this issue. Browning v. State, 120 Nev. 347, 354, 91 P.3d 39, 45 (2004) (stating that "an appellant must present relevant authority and cogent argument;

continued on next page...

In deciding whether a pretrial identification is constitutionally sound, the test is whether, considering the totality of the circumstances, the identification procedure "'was so unnecessarily suggestive and conducive to irreparable mistaken identification that [appellant] was denied due process of law.'" *Banks v. State*, 94 Nev. 90, 94, 575 P.2d 592, 595 (1978) (alteration in original) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). "First, the procedure must be shown to be suggestive[ ] and unnecessary [due to] lack of emergency or exigent circumstances." *Id.* If the procedure is suggestive and unnecessary, "the second inquiry is whether, under all the circumstances, the identification is reliable despite an unnecessarily suggestive identification procedure." *Id.* "Reliability is the paramount concern." *Jones v. State*, 95 Nev. 613, 617, 600 P.2d 247, 250 (1979). As long as the identification is sufficiently reliable, "it is for the jury to weigh the evidence and assess the credibility of the eyewitnesses." *Gehrke v. State*, 96 Nev. 581, 584, 613 P.2d 1028, 1029 (1980).

*Exigent circumstances justified the show-up identification procedure*

A show-up "is inherently suggestive because it is apparent that law enforcement officials believe they have caught the offender." *Jones*, 95 Nev. at 617, 600 P.2d at 250. However, countervailing policy considerations may justify the use of a show-up. *Id.* Countervailing policy considerations are related to the presence of exigent circumstances that necessitate prompt identification. *See Gehrke*, 96 Nev. at 584 n.2, 613 P.2d at 1030 n.2. Examples of exigencies sufficient to justify a show-up

---

...*continued*
issues not so presented need not be addressed by this court" (internal quotations omitted)).

include: (1) ensuring fresher memory, *Jones*, 95 Nev. at 617, 600 P.2d at 250; (2) exonerating innocent people by making prompt identifications, *id.*; and (3) ensuring that those committing serious or dangerous felonies are swiftly apprehended, *Banks*, 94 Nev. at 95, 575 P.2d at 595. Where exigencies such as these are absent, however, show-ups are not justified. *See Gehrke*, 96 Nev. at 584, 613 P.2d at 1030.

In this case, exigent circumstances justified the show-up identification procedure. Specifically, the show-up was necessary to quickly apprehend a dangerous felon. *See Banks*, 94 Nev. at 95, 575 P.2d at 595-96. In *Banks*, the victim picked up hitchhikers who proceeded to rob him at gunpoint. *Id.* at 92, 575 P.2d at 594. The court stated that "[i]t was imperative for the police to have a prompt determination of whether the robbery suspects had been apprehended or were still at large." *Id.* at 95, 575 P.2d at 596.

This case is similar to *Banks*. Here, two suspects who had just committed a murder during the course of an armed robbery were at large after fleeing Chenault's apartment. Like *Banks*, anyone near the suspects was a potential victim. *See id.* at 95, 575 P.2d at 595-96. Furthermore, the suspects took the marijuana from Chenault's apartment and thus could have likely committed further illegal acts by either selling the marijuana in their possession or committing additional robberies. Therefore, it was essential for the suspects to be swiftly apprehended. Since exigent circumstances existed in the present case, we hold that the show-up identification procedure was justified.

*The show-up identification was unreliable*

Nevertheless, when dealing with pretrial identification procedures, "[r]eliability is the paramount concern." *Jones*, 95 Nev. at 617, 600 P.2d at 250. In deciding whether a show-up identification procedure is reliable, we consider factors including: (1) the opportunity of the witness "to view the [suspect] at the time of the crime," (2) the degree of attention paid by the witness, (3) "the accuracy of [the witness's] prior description of the [suspect]," (4) "the level of certainty demonstrated at the [show-up]" by the witness, and (5) the length of time between the crime and the show-up. *Gehrke*, 96 Nev. at 584, 613 P.2d at 1030.

Here, although the record suggests that Chenault may have had ample opportunity to view the suspects while they looked around her apartment and conducted the drug deal, the record also suggests that she may not have been paying sufficient attention to them. The record suggests that Chenault appeared uncertain during the show-up, as her description of the suspect was inaccurate with regard to Taylor. Furthermore, the circumstances of the show-up—which occurred nearly eight hours after the crime occurred—were highly suspect. Therefore, we hold that the identification of Taylor was unreliable for purposes of a show-up.

*The in-court identification by Chenault was independently reliable*

The United States Supreme Court has held that even where an unnecessarily suggestive pretrial procedure occurs that produces an unreliable identification, subsequent in-court identification by the same witness is not necessarily excluded where the in-court identification itself is found to be independently reliable. *Manson v. Brathwaite*, 432 U.S. 98, 112-14 (1977). The factors to be considered are identical to those

SUPREME COURT
OF
NEVADA

(O) 1947A

enunciated in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *Id.* This court has adopted the same standard. *Browning v. State*, 104 Nev. 269, 273-74, 757 P.2d 351, 353-54 (1988).

Here, Chenault's observation of the suspects in her apartment likely constituted a sufficient independent basis for her in-court identification of Taylor. The suspects were in her apartment for some time, and she got at least one good look at the suspect she identified as being Taylor when they stood face-to-face. Indeed, we have held that similar observations constitute a sufficient independent basis for an in-court identification. *Banks*, 94 Nev. at 96, 575 P.2d at 596. In *Banks*, "a good look" at the suspects was enough to allow the in-court identification. *Id.*; *Boone v. State*, 85 Nev. 450, 453, 456 P.2d 418, 420 (1969) (holding that "one good look" during a car chase was sufficiently reliable). Similarly, in *Riley v. State*, 86 Nev. 244, 468 P.2d 11 (1970), an observation of seven seconds or less of the suspects was sufficiently reliable for the in-court identification.

*The error was harmless*

Where an error is preserved and is of a constitutional nature, the prosecution must show, "beyond a reasonable doubt, that the error did not contribute to the verdict." *Valdez v. State*, 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008).

Here, although the district court erred by allowing the out-of-court identification into evidence, the error was cured by the later in-court identification because it had a sufficient independent basis. Thus, it is clear beyond a reasonable doubt that the error did not contribute to the verdict.

*The prosecutorial conduct during closing arguments did not violate Taylor's Sixth Amendment right to a fair trial or Fifth Amendment right against self-incrimination*

*The PowerPoint slide with "GUILTY" superimposed on it did not violate Taylor's right to a fair trial*

The purpose of closing arguments is to "enlighten the jury, and to assist . . . in analyzing, evaluating, and applying the evidence, so that the jury may reach a just and reasonable conclusion." 23A C.J.S. *Criminal Law* § 1708 (2006) (citations omitted). However, "counsel must make it clear that the conclusions that he or she urges the jury to reach are to be drawn from the evidence." *Id.* Importantly, a prosecutor may not declare to a jury that a defendant is guilty. *See Collier v. State*, 101 Nev. 473, 480, 705 P.2d 1126, 1130 (1985). In the context of PowerPoints used during trial, "a PowerPoint may not be used to make an argument visually that would be improper if made orally." *Watters v. State*, 129 Nev., Adv. Op. 94, 313 P.3d 243, 247 (2013) (reversing where PowerPoint slide with "Guilty" superimposed over defendant's image was displayed extensively during opening statement). However, this court has held that a photograph with the word "guilty" across the front shown during closing arguments is not, on its own, sufficient for a finding of error. *Artiga-Morales v. State*, 130 Nev., Adv. Op. 77, 335 P.3d 179, 182 (2014).

The State used the PowerPoint presentation to make an improper oral argument visually—namely, to declare to the jury that Taylor was guilty by superimposing "GUILTY" on a PowerPoint slide. However, the slide was displayed briefly only at the very end of the prosecutor's closing arguments, and the defense did not object to the slide. Accordingly, the PowerPoint slide, on its own, was not sufficient for a finding of error.

*The comments made during closing arguments did not violate Taylor's Sixth Amendment right to a fair trial or Fifth Amendment right against self-incrimination*

Taylor argues that the prosecutor made comments during closing arguments that could only be construed as the prosecutor's improper personal opinion that Taylor was guilty. Taylor also argues that the prosecutor impermissibly commented on his decision not to testify during trial.

> *The prosecutor's comments during closing arguments were permissible*

The "injection of personal beliefs into the argument detracts from the unprejudiced, impartial, and nonpartisan role that a prosecuting attorney assumes in the courtroom." *Collier*, 101 Nev. at 480, 705 P.2d at 1130 (internal quotations omitted). Therefore, prosecutors are prohibited from expressing their personal beliefs on the defendant's guilt. *Id.* However, "[s]tatements by the prosecutor, in argument, indicative of his opinion, belief, or knowledge as to the guilt of the accused, when made as a deduction or conclusion from the evidence introduced in the trial, are permissible and unobjectionable." *Domingues v. State*, 112 Nev. 683, 696, 917 P.2d 1364, 1373 (1996).

Here, one of the prosecutors stated, "The defense suggests that it's not [Taylor's] phone . . . , [and] I would submit to you [that the defense suggests this] because the person using that phone is guilty of the crimes charged in this case. So he's got to distance himself from that phone. But the evidence is overwhelming. He can't."

This statement was preceded by a review of the text messages between the cell phone recovered from Taylor and Pearson's cell phone. This was after the evidence tied Taylor to the phone number used to text Pearson. Therefore, in this instance, the prosecutor's comments were

Supreme Court
OF
Nevada

(O) 1947A

18

reasonable conclusions based on the evidence presented and were not improper. *Id.* Furthermore, the record substantiates the prosecutor's statement that the phone was Taylor's and that Taylor texted Pearson prior to the robbery-murder.

On rebuttal, the prosecutor said, "I submit to you that there's at least one person in this room who knows beyond a shadow of a doubt who killed . . . Pearson."[7] Like the statement addressed above, this statement followed a summation of evidence. The statement reflects the prosecutor's conclusions based on the evidence regarding the cell phone records and Archer's testimony regarding Taylor's behavior that day. Therefore, we hold that the prosecutor's statement was not improper. *Id.*

*The prosecutor did not comment on Taylor's decision not to testify*

The Fifth Amendment requires that the State refrain from directly commenting on the defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615 (1965); *Harkness v. State*, 107 Nev. 800, 803, 820 P.2d 759, 761 (1991). A direct comment on a defendant's failure to testify is a per se violation of the Fifth Amendment. *Harkness*, 107 Nev. at 803, 820 P.2d at 761. However, an indirect comment violates the defendant's Fifth Amendment right against self-incrimination only if the comment "was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify." *Id.* (internal quotations omitted).

Taylor contends that the prosecutor's statements were similar to those made in *Harkness* and thus deprived him of his Fifth Amendment

---

[7]The first prosecutor handled the State's closing argument, and the second prosecutor handled the State's rebuttal to the defense's closing argument.

SUPREME COURT
OF
NEVADA

(O) 1947A

rights. In *Harkness*, the defendant chose not to testify in his defense, and the prosecution commented on gaps in the evidence, intimating that the defendant was the only one who could resolve those gaps: "If we have to speculate and guess about what really happened in this case, whose fault is it if we don't know the facts in this case?" *Id.* at 802, 820 P.2d at 760 (internal quotations omitted). This court held those comments to be indirect references to the defendant's failure to testify. *Id.* at 804, 820 P.2d at 761. We also held that these comments violated the defendant's Fifth Amendment rights because, when taken in full context, there was a likelihood that the jury took those statements to be a comment on the defendant's failure to testify. *Id.*

In the present case, the prosecutor made the following comments:

> There has to be a rational explanation for the evidence. . . . I challenge you to come up with a reasonable explanation of the truth if it does not involve the guilt of Donald Lee Taylor. . . .
>
> . . . I submit to you that there's at least one person in this room who knows beyond a shadow of a doubt who killed . . . Pearson. And I submit to you if you're doing your duty and you're doing your job, you'll go back in that room and you'll come back here and you'll tell that person you know, too.

Although the comments by the prosecutor indirectly referenced Taylor's failure to testify, unlike the comments in *Harkness* that blamed the defendant for the lack of information about what had happened in that case, neither comment here "was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify." *Id.*

(internal quotations omitted). Therefore, there was no error and Taylor's Fifth Amendment right against self-incrimination was not violated.

*There was sufficient evidence at trial to support the jury's finding of guilt*

In reviewing the evidence supporting a jury's verdict, the question is not "whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude by evidence it had a right to [consider]." *Edwards v. State*, 90 Nev. 255, 258-59, 524 P.2d 328, 331 (1974). "Moreover, a jury may reasonably rely upon circumstantial evidence; to conclude otherwise would mean that a criminal could commit a secret murder, destroy the body of the victim, and escape punishment despite convincing circumstantial evidence against him or her." *Wilkins v. State*, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).

The evidence here indicated that, prior to the murder, Taylor and Pearson had discussed and planned a sale of marijuana. Chenault's identification of Taylor placed him at the scene of the crime with a gun. She also testified that Taylor stated that he and the other suspect were "taking [the marijuana]" after Pearson demanded payment. Chenault further testified that she heard gun shots and saw Pearson lying in a pool of blood. Finally, Chenault testified that she saw the men take what she believed to be the marijuana before fleeing the scene.

In addition to this evidence, cell phone records connected Taylor and Pearson with calls and text messages prior to the offense and placed Taylor near the crime scene around the time of the murder. Evidence also showed that Taylor subsequently engaged in furtive behavior after the offense, telling Archer to delete text messages, that "it's all bad," and that he had to get out of the state.

We conclude that the evidence was sufficient to establish that Taylor entered Chenault's apartment with the intent to commit a felony, that he conspired to commit a robbery, that he unlawfully took property from Pearson by use of a deadly weapon, and that he committed the unlawful killing of a human being during the commission of a robbery. When viewed in the light most favorable to the State, there was sufficient evidence for the jury, acting reasonably, to have been convinced beyond a reasonable doubt that Taylor was guilty of these crimes. *Edwards*, 90 Nev. at 258-59, 524 P.2d at 331.[8]

## CONCLUSION

The district court did not err by allowing access to historical cell phone information obtained without a warrant because a defendant does not have a reasonable expectation of privacy in business records made, kept, and owned by his provider. Thus, the "specific and articulable facts" standard set forth in 18 U.S.C. § 2703(d) is sufficient to obtain historical cell phone information. Although the district court erred by admitting the out-of-court identification, the error was harmless beyond a reasonable doubt and the subsequent in-court identification of Taylor had a sufficient independent basis. Additionally, there was no prosecutorial misconduct during closing arguments because the PowerPoint slide, on its own, was not sufficient for a finding of error, and the prosecutors' statements were reasonable conclusions based on the evidence presented at trial. Furthermore, neither comment by the prosecutors was of such character that the jury would naturally and necessarily take them to be

---

[8]Because we hold that only one error was committed by the district court, we do not reach the issue of whether there was cumulative error.

comments on Taylor's failure to testify.   Lastly, there was sufficient evidence at trial to support the jury's finding of guilt.   Accordingly, we affirm the judgment of conviction.

_____, J.
Saitta

We concur:

_____, J.
Hardesty

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A